### In re CENDANT CORPORATION PRIDES LITIGATION.

### No. CIV. 98–2819(WHW).

United States District Court,
D. New Jersey.

Aug. 24, 2001.

Gerald T. Ford, Landman Corsi Ballaine & Ford, Newark, NJ, for The Chase Manhattan Bank, as custodian for Capital Income Builder, Inc., Income Fund of America, Inc. and Capital World Growth and Income, Inc.

Michael M. Rosenbaum, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for Cendant Corporation and Cendant Capital I.

## OPINION

WALLS, District Judge.

Before the Court is the renewed motion by Chase Manhattan Bank ("Chase") pursuant to Rule 60(b) for relief from this Court's January 14, 2000 order, which granted Cendant's motion to disallow claims made by Chase on behalf of certain funds, Income Fund of America ("IFA") and Word Growth Fund ("World Growth") to participate in the settlement of this action. The renewed motion also seeks relief from the initial denial by the Claims Administrator, Valley Forge Administrative Services ("Valley Forge") of the claim made by Chase on behalf of its Capital Income Builders ("CIB") fund.

In this Court's June 7, 2000 Opinion (the "June 7 Opinion"), this Court denied Chase's motion and found that Chase had not established the requisite excusable neglect under Rule 60(b) for its late cure of the IFA and World Growth claims and its failure to cure the CIB claim. *See In re Cendant Prides Litig.*, 98 F.Supp.2d 602 (D.N.J.2000). The Third Circuit reversed and remanded for further findings of fact and additional explanation of the relevant factors for excusable neglect under *Pioneer Investment Services, Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), and its progeny. *In re Cendant Corp. PRIDES Litig.*, 234 F.3d 166 (3d Cir.2000) ("*PRIDES II*"). The motion is again denied.

## BACKGROUND [1]

### I. Chase's Proofs of Claim

Chase filed claims on behalf of three funds for which it served as trustee and which held PRIDES as of April 15, 1998: Income Fund of America ("IFA"), World Growth Fund ("World Growth") and Capital Income Builders ("CIB"). Chase had submitted timely Proofs of Claim for each of these three clients, which included computer printouts which listed each fund's purchases of Prides. Valley Forge determined that none of these Proofs of Claim included the proper supporting documentation to establish that each Chase client held Prides as of April 15, 1998, as required by the settlement and the instructions for the Proof of claim forms. The instructions directed that claimants submit either monthly brokerage account statements or other documents maintained in the ordinary course of business which indicated that the Prides were held as of April 15, 1998. Chase argues that all three of its proofs of claim forms were not deficient and that Valley Forge should not have rejected them on the basis that computer

---

1. The background of this litigation is detailed in several of this Court's previous opinions. *See In re Cendant Corp. Litig.*, 182 F.R.D. 144 (D.N.J.1998); *In re Cendant Corp. Prides Litig.*, 51 F.Supp.2d 537 (D.N.J.1999); *In re Cendant Corp. Prides Litig.*, 189 F.R.D. 321 (D.N.J.1999). The Court will also presume familiarity with the settlement of the PRIDES class action litigation and with this Court's and the Circuit's earlier opinions regarding Chase's Rule 60(b) motion. *See In re Cendant Corp. PRIDES Litig.*, 234 F.3d 166 (3d Cir. 2000) ("*PRIDES II*"); *In re Cendant Corp.*

*Prides Litig.*, 98 F.Supp.2d 602 (D.N.J.2000). Although the "Rights" recoverable by claimants eligible to participate in the settlement expired on February 14, 2001, this Court entered an Order on February 7, 2001 which provided that if this motion were resolved after February 14, and the ultimate resolution allowed any of Chase's three disallowed claims, then Cendant would instead grant to Chase an amount of Cendant common stock equivalent to the Rights it would have received in the settlement.

screen printouts were not maintained in the ordinary course of business. In addition, Chase argues that even if the Proofs of Claim were deficient, it is entitled to relief under Rule 60(b) for its failure to cure the CIB claim and its late cure of the IFA and World Growth claims.

### A. *CIB*

Cendant contends that Valley Forge sent Chase a request to cure the Proof of Claim for CIB on July 19, 1999. Chase did not respond to the July 19, 1999 request to cure. JA 936. Chase claims that it never received this letter. JA 936. Cendant also claims that because Chase did not respond to this letter, Valley Forge sent an August 17, 1999 letter that advised Chase its CIB claim had been rejected. JA 1051. Chase claims it also did not receive this letter. JA 936. Chase received 145 other rejection letters which properly denied claims on behalf of other Chase–Cendant securities accounts which did not hold Prides. JA 936; 932. Chase was sent an August 5, 1999 letter that also contained a request to cure. The August 5, 1999 letter is stamped "received" by Chase's Class Action Group on November 15, 1999. JA 922. This letter stated:

> We have not received your response to our request for additional documentation that indicates holdings in Cendant PRIDES as of 41/15/98. The documentation you provided only indicates purchases as of 3/2/98, please [sic] provide any additional documentation to show all transactions through 4/15/98. . . .

JA 992. The form requested that Chase fill out and sign the bottom of the form which provided a space to fill in the number of PRIDES held as of April 15, 1998. JA 992. It also asked for additional documentation, such as a monthly brokerage statement or "a letter from an authorized representative or your institution showing the necessary information with a signature guarantee." JA 992. Apparently, Alex Marengelli, Second Vice President of Special Services, filled out this form and sent it in to Valley Forge in an envelope postmarked January 4, 2000. *See* JA 935, at ¶ 20.

Chase asserts that as a result of its failure to receive all of these letters, it remained unaware of the rejection of the CIB claim until it investigated "its failure to receive the Rights due on its claims." *See* Chase Br., at 7; JA 1040–43.

### B. *IFA and World Growth*

Valley Forge sent two letters to Chase dated July 15, 1999, which requested proper documentation for IFA and World Growth that those accounts held Prides as of April 15, 1998. JA 990–91. Those letters also required a response within twenty days of the date of the letters. Chase claims that the language that references the twenty day deadline was in "non-prominent" print at the bottom of the one-page letter. Chase Br. at 9. Chase asserts that because the letters were not received until July 28, 1999 by Chase's Class Action Group in New York City, an inference can be drawn that the letters were not mailed on July 15, 1999, as indicated on the letters. Chase Br. at 9; JA 937.

Heather Collins, a securities clerk at the Class Action Group, received the July 15 requests to cure on July 28 and states that she began to process them. JA 1031–32. According to her, the request to cure requested either "complete March and April 1998 monthly brokerage statement[s] or complete year-end transaction summary from your brokerage firm" or "Page 1 of your monthly statement or a trade confirmation slip." JA 1032, ¶¶ 5–6. She states that because the PRIDES held by IFA and World Growth were not held in a brokerage account, such records did not

exist, and it was unclear to her what records she could submit. *Id.* at ¶ 9. Furthermore, she would have consulted with her supervisor, Monica Watson, but Ms. Watson was out ill during that week. *Id.* at ¶ 9. She states that she called various Chase officers to determine what records would qualify and eventually determined that the "TN2 754: Security Holders Report" would suffice. *See id.* at ¶ 10–11. She argues, however, that because she received the letter on July 28, she had only seven days remaining to respond, two of which were weekend days, and consequently she did not have enough time to respond. *Id.* at ¶ 12. She eventually faxed the documentation to Valley Forge on August 12, 1999. *Id.* at ¶ 14. This was technically eight days late according to the July 15 mailing date of the requests to cure, or four days late as a result of the court's addition of the four-day mailing grace period in its January 14 order. Ms. Collins further asserts that on August 12, 1999, she called Valley Forge to confirm that the fax was received. A woman named "Danielle" at Valley Forge informed Ms. Collins that "IFA's and World Growth's Proofs of Claim were now in order." *Id.* at ¶ 14. Valley Forge approved the IFA and World Growth claims for participation in the settlement. JA 921–923.[2]

Chase argues that Ms. Collins was unable to respond within the required time because the requests "demanded that Chase provide brokerage statements" for the IFA and World Growth claims, which was impossible. Chase Br. at 9, JA 1033–34. The requests to cure also stated, "These documents must indicate the number of Growth and/or Income Prides held as of April 15, 1998." JA 990–991. Chase

argues that the requests to cure did not reference the option of producing other types of records maintained in the ordinary course of business, an alternative explicitly made available in the original instructions to the proof of claim form. JA 409, 938.

Valley Forge sent Chase two follow-up request to cure letters dated August 5, 1999 regarding IFA and World Growth, identical to that sent for the CIB claim. Chase states that it did not receive these two letters at its Class Action Group until November 15, 1999, and the letters both bear stamps with that date. *See* JA 939–940, at ¶ 33. Alex Marengelli filled out both forms and sent them to Valley Forge in an envelope dated January 4, 2000. *See* JA 940, at ¶ 34.

Valley Forge claims to have sent to Chase letters dated August 27, 1999 with regard to the IFA and World Growth claims, which advised that Chase should submit excuses for the late cures to the Court by September 6, 1999. Chase responds that it did not receive either August 27 letter. It further argues that the IFA letter must have been misdirected because the wrong control number was contained on the IFA account notice (7808 instead of 7807).

## II. Cendant's Motion to Disallow Proofs of Claim

On September 7, 1999, Cendant filed a motion to disallow proofs of claim that were accepted by Valley Forge after the filing deadline or were cured after the deadline to cure deficient Proofs of Claim. Lead Counsel cross-moved on behalf of class members whose claims were disputed

---

2. Cendant does not submit any documentation from Valley Forge either to confirm or refute that Ms. Collins did speak to a Valley Forge employee after faxing the cure documentation. However, it is undisputed that Valley Forge did approve the IFA and World Growth claims after the cure documentation was submitted.

for an extension of time to file late claims and late cures under Fed.R.Civ.P. 6(b)(2). On October 21, 1999, this Court denied Cendant's motion and granted Lead Counsel's cross-motion for an extension of time for the "late claim" claimants to submit proofs of claim and for the "late cure" claimants to submit cure documentation. *In re Cendant Corp. Prides Litig.*, 189 F.R.D. 321, 327 (D.N.J.1999) ("October 21 decision"). The deadline for submission of claims and cure documentation was extended to September 7, 1999. This Court stated that it would review the reasons for each late claim and late cure to determine if the delay was caused by "excusable neglect." *Id.* The Court further held:

> Lead Counsel is invited to submit additional information provided by these claimants to support their disputed claims if such information was sent before the cut-off date of September 7, 1999. The Court will examine these claims for validity at the time it conducts its "excusable neglect" analysis of late claims.

*Id.* at 328.[3]

On January 14, 2000, this Court finished its analysis of the late claims and late cures and issued an order which allowed certain late claims. *See In re Cendant Corp. Prides Litig.* (D.N.J. Jan. 14, 2000) (the "January 14 order"). That decision allowed late cure claimants a four day grace period in addition to the twenty days allotted by the requests to cure. JA 27–32. On February 22, 2000, the Court issued an order that authorized distribution of rights to settling Prides plaintiffs and designated the October 21 and January 14 decisions as final and appealable judgments.

The January 14 order disallowed the claims of 56 "late cure" claimants and those of 30 "late claim" claimants. Among the claims the Court rejected were those submitted by Chase on behalf of IFA and World Growth, because no excuse had been provided by September 7 as required. *See* JA 32. The decision referred to the IFA claim as "Investment Compa[n]y of America," because it had been listed under this name in Cendant's brief, although both Cendant's brief and the January 14 order listed the correct control number for IFA, 7807. Because the claims administrator had denied the CIB claim due to Chase's failure to provide any cure documentation, that claim was not included either in Cendant's motion or mentioned in the January 14 Order. Lead Counsel wrote to the rejected claimants to inform them their claims had been denied and that they should retain new counsel to pursue any appeal. JA 1023. Lead Counsel sent this letter to Chase by Federal Express to a clerk in a Brooklyn Chase office, at Chase's direction.

### III. Chase's Rule 60(b) Motion

On April 24, 2000, Chase moved under Rule 60(b) to modify the Court's January 14 and February 22 Orders, due to "mistake, inadvertence or excusable neglect," to approve its Prides settlement claims.[4] It also moved to vacate Valley Forge's denial of the CIB claim.

On June 7, 2000, this Court denied Chase's motion. Under the "excusable neglect" standard, the Court found that

---

**3.** The Third Circuit affirmed this Court's extension of the deadlines and its decision to use an excusable neglect analysis for late claims and late cures. *See In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 189–90 (3d Cir.2000) (*"Prides I "*).

**4.** This motion was consolidated with one filed by Mellon Bank and Boston Safe & Trust Co. ("Mellon") to modify the same orders to allow its claims. The Court determined that Mellon had established excusable neglect and granted Mellon's motion to allow its claims.

Chase had provided an insufficient reason for its delay. It found that the delay was caused primarily by Chase's mail routing system and no one else and that such was not outweighed by factors such as Valley Forge's mistaken identification of Claim 7808 as Income Company of America instead of IFA. *See* 98 F.Supp.2d at 607–608. Specifically, this Court stated:

> The unjustified ineptitude of Chase evidences its neglect to timely file requests to cure, its neglect to participate in the challenges to disputed claims in the fall of 1999, and its failure to file this motion until April 2000 although Lead Counsel had informed it of the rejections in January 2000. These circumstances of neglect are inexcusable. Also the Court has the (circumstantial) sense that Chases's "... asserted inadvertence[s] reflect[ ] an easily manufactured excuse incapable of verification by the court."

*Id.* at 608, quoting *Dominic v. Hess Oil V.I. Corp.*, 841 F.2d 513, 517 (3d Cir.1988). This Court also rejected Chase's argument that its due process rights were violated by the 20–day response to cure deadline, because the claim timeline was heavily negotiated by the parties and Chase did not seek to intervene to object to the settlement deadlines. *Id.* at 608. Moreover, the Court found the 20–day response time reasonable because the Prides claimants already had 30 days to respond to the initial notice, were on notice of the settlement, knew what type of information was required to prove ownership and had already gathered and sent in at least some of the relevant information. *See id.*

Chase appealed this Court's decision. The Third Circuit remanded and directed this Court to explain in further detail its analysis of the *Pioneer* factors, which include (1) the danger of prejudice to the non-movant; (2) the reason for the delay;

(3) the length of delay and impact of that delay on judicial proceedings; and (4) Chase's good faith in bringing the motion. *In re Cendant Corp. PRIDES Litig.*, 234 F.3d 166, 170–73 (3d Cir.2000) ("*Prides II* "), citing *Pioneer,* 507 U.S. at 395, 113 S.Ct. 1489. It found that although the Court had discussed the reason for delay with respect to the Growth and IFA claims, it directed this Court to examine "both [Valley Forge's] and [Lead Counsel's] actions in determining whether Chase's delay [was] excusable." *Id.* at 172–73. With regard to the prejudice factor, the Circuit referred this Court to the Circuit's earlier opinion which had found that Cendant would not be prejudiced by allowing additional claims to proceed. *Prides I,* 233 F.3d 188, 196 n. 8. Finally, the Third Circuit directed this Court to fill in certain "factual gaps" that it considered necessary to analysis of the *Pioneer* factors. *Id.* at 193–94. Although that Court cautioned this list was not "exhaustive," it asked this Court to consider the following:

1. Whether the critical August 27, 1999 letters "were sent, and if so, which party lost them";

2. Whether under the October 21, 1999 order, the Court would have been willing to consider any excuses that were offered after September 7, 1999;

3. Whether it was reasonable for Class counsel to have sent the January notification letter by Federal Express to the Brooklyn address, instead of to the designated P.O. Box by mail, and whether Federal Express delivers to P.O. Boxes; and

4. Whether it was reasonable for Class counsel not to have faxed the January notification letter in addition to the Federal Express copy sent.

*Id.* at 193–94.[5]

### DISCUSSION
### Specific Factual Issues: The Letters

The Third Circuit has asked this Court to examine the degree to which the actions of the Settlement Administrator and/or Lead Counsel may have contributed to the various delays that led to the ultimate failure of Chase to provide either its cure documentation for CIB or excuses for its late cure of the IFA and World Growth claims. As directed, this Court will examine each of the four enumerated factual issues in detail. A complete set of factual findings and conclusions of law follows. Specifically, the Third Circuit directed this Court to determine whether the August 27, 1999 letter(s) were actually mailed, and if so, which party lost them, as well as any other important factors. *PRIDES II,* 234 F.3d 166, 172–73. In order to evaluate the relative culpability, if any, of Lead Counsel and Valley Forge, as compared to Chase, this Court believes it is necessary to evaluate the circumstances surrounding *all* of the numerous letters which Chase claims it either did not receive or received late.

Valley Forge claims to have sent request to cure letters to Chase for each of its three funds; follow-up request to cure letters to each of the three; a Notice of Disallowance letter with regard to CIB; and August 27, 1999 letters with regard to IFA and World Growth, which requested that claimants send explanations to the Court as to why claims and/or cure documentation were sent late. To establish that Valley Forge mailed the various letters, Cendant submits two affidavits by Christopher Ewing, Assistant Vice President of Valley Forge. JA 1100, 1243. Ewing was the Assistant Vice President of Valley Forge and was responsible for day-to-day services regarding administration of the Prides settlement. With regard to the specific letters that were sent to Chase, Ewing states:

9. ... CIB, Control No. 7756, was sent a Request to Cure letter dated July 19, 1999, to the address on the Proof of Claim.... No response was received by VFAS to either the July 19th letter or an August 5, 1999 letter that was sent as a second request to cure. Accordingly, VFAS sent to Chase a Notice of Disallowance letter on August 17, 1999 rejecting the CIB claim.... The August 17, 1999 letter sent to Chase, as well as all other rejection letters sent by VFAS, clearly indicated that the claim was rejected. Specifically, the rejection letters, including the August 17th letter to Chase, stated that the claimant had the right to seek review of "this decision rejecting your claim" by the Court, and that "[y]ou must file such a request with the Court within 20 days from the date of this rejection notice."

10. On July 15, 1999, VFAS sent to Chase a Request to Cure letter for each of IFA (Control No. 7807) and World Growth (Control No. 8259).... The two letters were sent to the P.O. box identified by Chase in the Proofs of Claim as the address at which to send such materials.

11. On August 12, 1999, Chase sent to VFAS, by fax, copies of the July 15, 1999 Request to Cure letters for IFA and World Growth, indicating by a stamp thereon that they had been received by the Chase Class Action Department on July 28,

---

**5.** The Third Circuit declined to address Chase's arguments that its initial proofs of claim were valid and that its due process rights had been violated. *Id.* at 189–90 n. 1.

1999 . . . . The August 12th fax included documentation to support the claims for IFA and World Growth. However, it was sent by Chase more than 20 days after the Request to Cure ha been sent by VFAS, and therefore was considered an untimely response to the cure request.

12. By letters dated August 5, 1999, VFAS had also sent to Chase, on behalf of IFA and World Growth, second Request to Cure letters. Those letters were also sent to the same P.O. box that Chase had listed in its Proofs of Claim. As with the July 15 Request to Cure letters, VFAS had not reason to believe that the August 5 letters did not reach the P.O. box within a day or two of their mailing.

13. On August 27, 1999 the [letters which urged claimants to write to the Court to explain why the Proof of claim was submitted after the June 18, 1999 deadline, or why the cure materials were received after the 20 day deadline, and that such information had to be received by the Court by September 6], were sent to all claimants who had filed late claims or late cures, including to Chase on behalf of IFA and World Growth. The August 27th letters were sent to Chase on behalf of IFA and World Growth because they had filed late cures and the claims were going to be objected to by Cendant. The August 27th letters sent to Chase were sent to the same P.O. box that Chase had listed on its Proof of Claim forms for IFA and World Growth. The August 27th letter was not sent to Chase for CIB because it had not responded to any request to cure.

14. No envelope mailed to Chase was ever returned to VFAS as being undelivered or undeliverable by the U.S. Postal Service.

15. All letters sent to Chase as described in the foregoing paragraphs, were mailed on the dates indicated on the letters.

JA 1102–1104 ¶¶ 9–15.

Valley Forge claims to have sent Chase August 27, 1999 letters for both IFA and World Growth which requested that Chase provide explanations to the Court for the late cure of these claims. JA 0148. Those letters stated:

> The claim you filed was either received by Valley Forge Administrative Services, Inc . . . . after the deadline for filing or your response to the cure notice was received after the 20–day allowable period.
>
> VFAS and class counsel believe that your claim should be accepted as valid. Cendant Corporation's Counsel may object to your claim being approved by the Court.
>
> In many, but not all, instances class counsel for the plaintiffs in this matter will advocate to the court that minor deficiencies are to be resolved in your favor.
>
> We cannot predict the outcome. *We urge you to write to the Court explaining why the form was submitted after the June 18, 1999 deadline, or why the cure notice was completed and submitted when it was.*
>
> *Your letter must be received by the Court by September 6, 1999 . . .*

JA 1056 (emphasis added).

Ewing describes the following general office procedures with regard to the July 1999 request to cure letters, the August 5, 1999 letters, the August 17, 1999 notices of

disallowance, and the August 27, 1999 letters:

7. Each of the types of documents described above were *mailed by First Class U.S. Mail* on the date reflected on the document. The Request to Cure letters, disallowance letters and August 27 letters were placed in envelopes addressed to the claimants, based upon addresses they had provided on their Proofs of Claim. Each envelope contained a return address that was printed on the envelope. Each envelope contained appropriate First–Class postage. VFAS maintained copies of every letter sent out in connection with its services rendered....

JA 1102 ¶ 7 (emphasis added). Regarding the August 27, 1999 letters, he also asserts, "The name and address of the actual claimant was contained on the mailing label for the envelope into which each of the August 27, 1999 letters were placed." JA 1102 ¶ 6.

Chase argues that it did not receive the CIB request to cure letter or the August 17 rejection letter for CIB. Chase argues that it likely did not receive the letters because they probably were not mailed. Although Christopher Ewing, Valley Forge's former president, previously submitted a sworn statement that all request to cure letters had been mailed on or before July 17, 1999, Chase states that Valley Forge now concedes that the alleged request to cure was sent on July 19, 1999. Valley Forge does not dispute that this request to cure letter was actually sent on July 19 instead of July 17 as originally asserted.[6] Chase advances as

evidence that those two letters were likely not mailed its receipt of the 145 other rejection letters sent by Valley Forge with regard to Chase's claims on behalf of other funds which held Cendant securities, but not Prides.

Chase asserts that it did not receive the IFA and World Growth request to cure letters until July 28, 1999 at its Class Action Group. Chase submitted an affidavit to claim that it is not unusual for mail to take 10 to 15 days to reach Chase's P.O. Box, due to delays caused exclusively by the U.S. Postal Service. According to Anthony Olszewski, a Chase Vice President in the Risk Management Group, he conducted an investigation of the mail distribution at Chase. He says that ordinarily, it takes only three to four business days for mail to circulate from the P.O. Box to the appropriate person in the Class Action Group, but that sometimes, mail received at the P.O. Box might be postmarked up to 10–15 days before its arrival. *See* JA 1038; 1241–42. Chase advances that the delays in receipt at its Class Action Group are not due to internal mail distribution delays but are more likely due to long delays by the U.S. Postal Service. Chase Br. at 30. Furthermore, Chase avers that Valley Forge did not consistently mail letters on the dates reflected. It offers as evidence a request to cure letter dated July 7, 1999, which was apparently contained in an envelope dated July 8, 1999.[7] *See* Cendant Br. at 28; JA 1157–58, 1209–10. It also points out that the notice letter which informed Chase incorrectly that it was to receive distribution of Rights on March 14, 2000 was actually postmarked March 16,

---

**6.** Moreover, it argues that this letter was not late under the settlement deadline of July 18 because that day fell on a Sunday.

**7.** The Court will assume for purposes of this motion that this assertion is correct, as Cen-

dant apparently does not dispute this fact. However, the claimant's name and address on the photocopy of the letter referenced are illegible in the parties' joint appendix.

2000. *See* Cendant Br. at 28; JA 1019–1020. Chase maintains that this evidence of some delays in the mailing of requests to cure and other notice letters negates Ewing's assertion of mailing dates. Because, according to Chase, Ewing's assertion that the letters were mailed on the dates indicated does not demonstrate that the IFA and World Growth request to cure letters were actually mailed on those dates, Chase concludes that Cendant has failed to establish that Chase's responses to those letters were in fact late.

Chase also argues that Ms. Collins responded promptly to the request to cure letters once she received them, and contends that eleven days was a reasonable amount of time to respond to what it maintains was a confusing notice. Chase Br. at 31. Furthermore, Chase argues that the 20–day time restriction was unreasonable because it failed to take into account normal potential delays in the arrival of mail and internal distribution. *Id.*

Chase argues that it did not receive an August 27 letter for any claim because it has no record of receipt of the August 27 letters. *See* JA 940 ¶ 35. Chase advances the following facts as evidence the letters were not mailed as Valley Forge and Cendant contend:

- 58 % of the 149 late cure claimants and 56% of the 54 late claim claimants did not provide an excuse to the Court in response to the August 27 letter (Chase Br., at p. 12; JA 1154–56);
- Valley Forge addressed the letters only to "Claimant" to save space instead of using the full address as it usually did (Chase Br. at 12; JA 1030; JA 1056);
- Valley Forge omitted contact person names, organizations and account numbers on the envelopes (Chase Br., at 13; JA 1156–57; 1181–1208);

- the letters were prepared, addressed and mailed during a hurricane when Valley Forge lost electrical power (Chase Br. at 13, 37; JA 1243);
- because of the power outage, Valley Forge handwrote claimants' names and addresses on 40% of the envelopes, without keeping track of which ones were hand-addressed (Chase Br. at 13, 38; JA 1243); and
- Valley Forge provided no evidence how its staff reliably accomplished the mailing without lights, how it was able to deliver the letters to the Post Office in the middle of a hurricane, or which 40% were hand addressed and which were not (Chase Br. at 13).

Cendant argues that Ewing's affidavit sufficiently establishes its regular office mail procedures and describes the regular mail procedures used with regard to the August 27 letters. Cendant Br. at 4–5. Chase maintains that this evidence is insufficient to substantiate Valley Forge's claim that it mailed the letters because Ewing did not claim personal knowledge of the mailing of any specific letter. Nor did Cendant submit any records from Valley Forge to corroborate Ewing's declaration, such as mailing receipts, mailing labels or computerized mailing lists. (Chase Br. at 8.) Moreover, says Chase, Valley Forge sent Chase a March 14, 2000 letter which advised that it was about to receive settlement proceeds, indicating that Valley Forge's computer records might contain errors. (Chase Br. at 8.) According to Chase, Valley Forge has never explained this error. (*Id.*)

With regard to the August 27, 1999 letters, Chase contends that Cendant sets forth no evidence concerning established procedures to address the letters—"how Valley Forge ensured that letters were fully and properly addressed, contained the intended communication, were correct-

ly stamped and were placed in the hands of the Postal Service." Chase Br. at 43–44. It argues that this refutes Valley Forge's "conclusory" assertions that they were mailed or properly addressed. According to Chase, "The 58% response rate indicated that many late cure claimants were totally unaware of the need to submit an excuse." Chase Br., at 39.

Cendant contends that Chase's affidavits which deny receipt of the letters, along with its evidence of regular mail handling procedures, rebut any presumption of receipt of the missing letters or timely receipt of the late-received letters. Mr. Olszewski's declaration details a ninestep mail distribution procedure. He claims that mail typically takes three to four days to be routed to the Class Action Group, but asserts that he has noticed delays as long as ten to fifteen days between the postmark date and date of receipt at the P.O. Box. *See* JA 1036–39; 1241–42. 1241–42. Chase submits the Declaration of John Hughes, a Senior Vice President in charge of U.S. Securities Operations, which includes the Class Action Group. *See* JA 930–944. Mr. Hughes declares that (1) Chase has "no record" of receipt of the request to Cure letter for CIB; (2) Chase's Class Action Group did not receive the August 5, 1999 follow-up request to cure letters for CIB, IFA and World Growth until November 15, 1999; (3) Chase's Class Action Group did not receive the request to cure letters for IFA and World Growth until July 28, 1999; and (4) Chase never received any August 27, 1999 letter advising of the need to send an excuse to the Court. *See* JA 934–941, at ¶¶ 17, 18, 25, 33, 34, 38. Chase also submits the Declaration of Cyril Valdez, a supervisor in the Class Action Group, who states that he had no record of receipt of the August 27, 1999 letters. *See* JA 1029, ¶ 6. Furthermore, Michael Coyne, Esq., Vice President and Assistant General Counsel of Chase, states in his Declaration that Chase did not receive the July 19, 1999 request to cure the CIB claim or the August 17, 1999 notice of rejection of the CIB claim. JA 1043.

Cendant responds that Chase's own affidavits do not refute the evidence of mailing—and hence the presumption of receipt—because Chase does not submit any affidavit of an employee who works either in the mail department or in the area where the post office box is located. Cendant further states that the two affiants who reference the August 27 letters, John Hughes and Anthony Olszewski, have no personal knowledge of the processing of mail at Chase's P.O. Box. It also contends that Chase has no basis to determine whether the letters were actually received because none of its witnesses has personal knowledge and Chase does not keep a log of incoming mail. *See* Cendant Br., at 5; JA 1037. Cendant argues that mere declarations of non-receipt are insufficient to rebut the presumption of mailing. *See* Cendant Br. at 6.

Chase next contends that even if the August 27, 1999 letters had been received, they were purportedly sent before the October 21, 1999 decision by this Court that determined an excusable neglect analysis would be used for late cure and late claims. According to Chase, the letter only states that Cendant might object to certain claims and "merely suggests" that an excuse be provided. *See* Chase Br. at 11. Because it did not state the claim would automatically be denied, it lulled claimants into the belief that the claims should be accepted and that it was not mandatory to send a letter to the Court. Moreover, says Chase, even if the letters were sent on Friday, August 27, the earliest they could have been received is Monday, August 30. Because Monday, September 6 was Labor Day, the effective

deadline was Friday, September 3, leaving a maximum of four days from receipt of the letter until the due date of the response, leading to a one-to-three day turnaround time. *See* Chase Br., at 40 n. 19. Chase again argues, as it did in June, that the 20–day response time is both inadequate and unconstitutional.

Because of the substantial dispute over the adequacy of the information provided by Valley Forge about the mailing of the August 27 and other disputed letters, and because this Court determined that it would be appropriate to solicit additional information as to what Valley Forge meant by "mailed by U.S. Mail" when describing the procedures used to mail the letters, the Court required Valley Forge to submit an additional affidavit to further explicate the procedures outlined in paragraph 7 of Christopher Ewing's May 10, 2000 Affidavit.[8] In response, Valley Forge submitted the January 19, 2001 Affidavit of Kenneth Gross ("Gross Aff."), President of Valley Forge,[9] in which Mr. Gross describes the mailing procedures for the Request to Cure letters, disallowance letters, the Au-

gust 5, 1999 request to cure letters and the August 27, 1999 letters.[10] It also submitted the January 18, 2001 Affidavit of Michael Miller, the Senior Claims Administrator at Valley Forge. According to Mr. Gross, the requests to cure and disallowance letters were prepared by attaching a mailing label, with a photocopy of the letter inserted in the claimant's file, and placing the original into an envelope and into a mailing bin. First Class postage was applied in the mailing room, the letter then placed in a letter tray for delivery to the post office in Villanova, Pennsylvania. Valley Forge employees drove that mail to the post office and placed the trays in the sorting room as directed by the Postal Service employees. Gross Aff., at ¶ 3. Mr. Gross confirms Mr. Ewing's assertion that no envelope sent to Chase was ever returned as undeliverable by the postal Service. Gross Aff., at ¶ 4. Mr. Miller confirms that he personally performed many of the tasks described in Mr. Gross's affidavit: he applied mailing labels, made photocopies, stuffed the envelopes, placed letters in letter trays and either drove or

---

**8.** The Court required the submissions over the objection of Chase because it concluded that it had a duty to request easily obtainable information to fill in the factual gaps directed by the Third Circuit. The phrase "mailed by U.S. Mail" was too vague to determine whether the letters were either placed into a mail box or brought to the post office, as required to establish the presumption of receipt that arises from mailing. The Court also allowed Chase to depose Mr. Gross and Mr. Miller, restricted solely to the issue of the mailing procedures described.

**9.** Mr. Ewing is no longer employed at Valley Forge.

**10.** Chase points out that apparently Mr. Gross submitted two affidavits, one dated January 18, 2001 and one dated January 19, 2001 and claims the two are inconsistent. However, upon examination of the copy of a January 18, 2001 Affidavits submitted by Chase, the

Court concludes the two affidavits are identical except that the January 19, 2001 Affidavit has one added sentence in which Mr. Gross states he makes the affidavit upon personal knowledge. Although Chase objects to this "inconsistency," the Court finds it to be of no moment.

Chase objects that Mr. Gross testified at his deposition that he had no personal knowledge whether the mailing procedures were actually followed in this case or with regard to Chase specifically. However, it appears that Mr. Gross had personal knowledge that the procedures were established as he describes, and Mr. Miller had personal knowledge that they were in fact carried out. Chase also objects to the submissions because Christopher Ewing submitted the previous affidavits. However, the Court finds that the affiants have sufficient personal knowledge of the information contained in their affidavits to warrant their consideration.

rode to the post office to ensure that the letter trays were placed where directed by the postal service employees. *See* Miller Aff. at ¶ 4.

With regard to the August 27 letters, Mr. Gross states that a set of labels was generated from the database; a copy of the letter was placed into each envelope; each envelope received a mailing label or was hand addressed due to the power outage; the letters were delivered to the mailroom, postage applied and taken to the Post office by Valley Forge Employees. Gross Aff. at ¶ 4. He further states that no August 27 letter mailed to Chase was ever returned as undeliverable by the Postal Service. *Id.* Mr. Miller confirms that the procedures described by Mr. Gross were actually used with regard to the August 27 letters. He states that he personally witnessed the application of address labels and hand addressing of the envelopes using the address list provided by Christopher Ewing. Miller Aff. at ¶ 5. He further states that although the addressing was done in a conference room during a power outage, that room receives enough natural light through its large windows that Valley Forge routinely does work in that room without the lights on. *Id.* Mr. Miller attests that he personally applied postage and sealed the August 27 letters, placed the letters in letter trays, and personally drove the letters to the Post Office, where he placed the trays where directed by the Postal Service employees.

The Court permitted Chase to depose Mr. Miller and Mr. Gross to inquire about the mailing procedures described in their affidavits. At Mr. Gross' deposition, Mr. Gross produced Valley Forge's files for CIB, World Growth and IFA. The CIB file contains copies of the July 19 original re-

quest to cure, the August 5 second request to cure, and the August 17 rejection letter. That file does not contain a copy of an August 27 letter. The World Growth file contains a copy of the July 15 original request to cure, the August 5 second request to cure, and the August 27 letter. The IFA file contains a July 16 request to cure, the August 5 second request to cure, and the August 27 letter. Mr. Gross testified that the fact that these letters were kept in the files indicates to him those letters were mailed according to Valley Forge's established office procedures. The IFA file did not contain a copy of a letter marked as Exhibit KG–8, which is a request to cure letter dated July 15 for IFA, which Chase claims it did receive. The July 15 and 16 letters contain slightly different wording but otherwise are the same in substance.[11]

Also at Mr. Gross's deposition a postage log was produced, which lists the number of pieces of mail sent and total spent on postage for each batch of mail sent out. The log does not identify specific pieces of mail or recipients to whom letters were addressed. The log does not list any pieces of mail having been sent on August 27, 1999. Mr. Gross testified that he believed that because of the power outage and time pressure, the employees wanted to make sure the mail went to the post office and did not have time to log those letters.

Mr. Gross testified that either Mr. Miller or Mr. Ewing determined which claimants were to receive the August 27 letters. Although he was not entirely certain which criteria were used, he understood that if claimants were believed to be subject to disallowance, they were to receive the letters. He did not know which specific

---

**11.** Cendant submits a second affidavit from Ewing which asserts that he sent some claimants a second request to cure letter with his signature to ensure that the requests were sent to large institutional claimants. *See* JA 1244 at ¶ 3.

claimants were supposed to have received the August 27 letters. In addition, he stated that either Mr. Miller, Mr. Ewing, or another of a handful of employees would have done the hand addressing of the August 27 letters.

Furthermore, Mr. Gross testified that the August 27 letter was not required by the Stipulation of Settlement and was a product of discussions between himself and Mr. Kirby. He testified that the purpose of the letter was to make sure that those claimants whose claims or cures were mailed in late but otherwise were in order should have an opportunity to apply to the court to get their claims approved.

Mr. Miller testified that the reason that the letter marked as KG–8 was not in the original IFA file is that it was probably attached to a previous affidavit that was submitted in this matter with regard to Chase's motion, and that the file probably did not get put together completely again.

Mr. Miller stated that he personally participated in sending out the July request to cure letters and the August 1999 disallowance letters. However, Mr. Ewing sent out the August 5 letters himself. Mr. Miller participated in the placing the July request to cure letters, the August 1999 disallowance letters and the August 27 letters into envelopes, and placed copies of the letters in the files of claimants who received those letters. He did not recall which claimants were supposed to receive the August 27 letters. He stated that Valley Forge worked off a list generated by its database and that Mr. Ewing was responsible for generating the August 27 letter recipient list from that database. According to Mr. Miller, the original list was either lost or destroyed, apparently because Valley Forge decided it did not

need to keep the list once the letters were sent. The database apparently had a field code to indicate which claimants had sent in late claims and/or late cures. Those claims which were accepted or rejected had a code so indicating in the same field. Accordingly, one could perform a search on the database to print out a list of all claimants with late claims and/or cures. Unfortunately, once the list was printed, and the claims were ultimately accepted and rejected by this Court, Valley Forge went back into the database and recorded all the claims to indicate whether they had been accepted or rejected. Those claims listed as having had late claims and/or cures in that code field now list either accepted or rejected, so it is not possible for Valley Forge to recreate the list using the same field search to re-generate a list with the names of the intended recipients of the August 27 letter.[12]

When one party seeks to prove that a letter was received, it is well-settled that if the letter is proved to have been mailed, it is presumed to have been received in the usual course of business. *See Rosenthal v. Walker*, 111 U.S. 185, 193, 4 S.Ct. 382, 386, 28 L.Ed. 395 (1884); *Schutz v. Jordan*, 141 U.S. 213, 220, 11 S.Ct. 906, 908, 35 L.Ed. 705 (1891); *Hagner v. U.S.*, 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932). This presumption is rebuttable. *U.S. v. Galiczynski*, 44 F.Supp.2d 707, 714 (E.D.Pa.1999); *Linder v. Trump's Castle*, 155 B.R. 102, 104–105 (1993).

For the presumption to arise, the party must prove that the letter was mailed. *See Mosel v. Hills Dep't Store*, 789 F.2d 251, 253 n. 2 (3d Cir.1986); *Williams v. Chrysler Corp.*, 991 F.Supp. 383, 388 n. 6 (D.Del.1998), citing *Tisch Family Founda-*

---

**12.** Although Valley Forge does have records of which claimants actually had late claims or late cures—those claimants who should have

been on the August 27 recipient list, it cannot now reproduce the list of recipients of the letter.

*tion, Inc. v. Texas Nat'l Petroleum Co.,* 326 F.Supp. 1128, 1132 (D.Del.1971); *Philadelphia Reserve Supply Co. v. Zarrelli,* No. Civ. A. 90–5680, 1993 WL 160119, * 4 (E.D.Pa. May 14, 1993) (Under Pennsylvania law, to establish presumption of receipt, sender must prove it was properly addressed and mailed); *Frederick v. T.U.C.S. Cleaning Services, Inc.,* Civ. A. No. 91–3747, 1991 WL 243538, * 1 (E.D.Pa. Nov. 15, 1991) (presumption arises only upon "proof that the item was properly addressed, had sufficient postage, and was deposited in the mail"); *Robinson v. American Int'l Adjustment Co.,* Civ. A. No. 90–1270, 1990 WL 100309, *4 (D.N.J. Aug. 9, 1990) (receipt of notice is presumed only upon proof of mailing).

 To prove that a letter was mailed, one must establish the following: That the envelope was addressed, that the letter was placed in the envelope, that the envelope was metered as to postage, and that it was placed in the mail. *Tisch Family Foundation,* 326 F.Supp. at 1132, citing I Wigmore, Evidence § 95 at 524; 31A C.J.S. Evidence § 136c. The rebuttable presumption may be established by pointing to circumstantial evidence that the letter has been mailed, such as evidence of standard operating office procedures or business practices regularly used. *See McCallum v. United States Dep't of Housing and Urban Devel.,* Civ. No. 85–4626, 1986 WL 14217, *3 (E.D.Pa. Dec. 15, 1986); *U.S. v. Galiczynski,* 44 F.Supp.2d at 714.

 The Court finds that Cendant has adequately established evidence that the following letters were mailed: For CIB, the July 19 original request to cure, the August 5 second request to cure, and the August 17 rejection letter; for World Growth, the July 15 original request to cure, the August 5 second request to cure, and the August 27 letter; and for IFA, the July 15 and 16 original requests to cure, the August 5 second request to cure, and the August 27 letter.

Here Cendant, through the affidavits and testimony of Valley Forge employees, has furnished evidence that the Requests to Cure, August 5 letters, the CIB disallowance letter and August 27 letters were mailed according to an established office procedure. Chase objects that Cendant has submitted no evidence which shows whether the specific letters to Chase were actually sent or even whether Chase's name was on the list of August 27 letter recipients, particularly since Mr. Miller admitted never having read the list and had no idea whether Chase was on it. It argues that the Court should not find that the August 27 letters were sent with regard to IFA and World Growth, because the original mailing list was destroyed and the database was overwritten. It further points out that although Valley Forge produced some pages from the "Postage Log" which list the amounts spent on postage on certain dates, those entries do not identify the claimants to whom any particular letter was sent. The Court agrees that the Postage Log does not provide any evidential value as to whether Chase was sent letters on any particular day.

Chase also objects that the sole physical documentation apart from the testimony of the Valley Forge employees (which it contends is insufficient on its own) are that copies of certain letters are contained in the claim files for Chase. However, Chase protests that each of Chase's Valley Forge claimant files is incorrect. First, it points to the fact that the July 15, 1999 request to cure letter for IFA which Chase did receive, in addition to the one mailed on July 16, is not contained in Valley Forge's IFA file; Valley Forge's CIB file mistakenly contains Chase's responses to the requests to cure the IFA and World Growth claims; and the March 14, 2000 letter for

World Growth received by Chase, which incorrectly advised that the World Growth claim had been approved, is not contained in Valley Forge's World Growth file. In addition, Chase argues that Valley Forge's files demonstrate that Chase's World Growth claim was listed as one of the "approved and undisputed Claims submitted and/or cured with a postmark no later than September 7, 1999," which it argues suggests the letter was never sent, because no letter was sent to claims that were approved and undisputed. Ford Apr. 2, 2001 Decl. Ex. D. The quoted document is an Affidavit of Christpher Ewing dated February 14, 2000. Chase argues this supports the contention that the August 27 letter was never sent for the World Growth claim, because no letter was sent to claimants whose claims were approved. According to Chase, this would also explain why Chase received a letter dated March 14, 2000 from Valley Forge which incorrectly advised that the World Growth claim had been approved. JA 1019.

Finally, Mr. Gross testified that the August 27 letter was not sent to claimants who had cured or had been approved. Chase advances that Chase's IFA and World Growth claims had been approved by Valley Forge and thus, according to Mr. Gross's testimony, the letter should not have been sent to Chase for those claims.

The Court rejects Chase's arguments. First, the Court finds that Mr. Gross's and Mr. Miller's testimony adequately establish that the office procedures outlined in their affidavits were followed for the request to cure letters, the August 5 letters, and the CIB disallowance letter. The Court finds that the copies of those letters contained in Valley Forge's files supports the conclusion that the procedures were in fact followed. The existence of an additional request to cure letter apparently sent on July 15 for IFA does not refute this conclusion. Nor does the absence from the IFA file of a copy of the July 15 IFA request to cure, because Chase admits that it received that letter. Furthermore, that copies of the returned requests to cure for both IFA and World Growth were misfiled in Valley Forge's CIB file does not refute that any of the letters were mailed. The Court finds that such may have occurred because of a simple misfiling, because the files were put back together incorrectly after copies were made to submit with various affidavits in this matter, or because all thee forms were returned to Valley Forge in the same envelope.

Moreover, Chase's contention that the IFA and World Growth requests to cure were likely not sent on July 15 and 16 as indicated on the letters, because Chase's Class Action Group did not receive them until July 28, is unsupportable. The existence of two unrelated letters which were mailed after the dates indicated thereon is irrelevant because it is not evidence that the IFA and World Growth requests to cure were not mailed.

The Court further finds that the evidence sufficiently demonstrates that an established procedure was used to mail the August 27 letters. Although the power outage at Valley Forge required the employees to hand address some of the envelopes (and the recipient list is not available or reproducible) the Court finds that Mr. Miller's testimony adequately establishes that these procedures were followed and the letters for both IFA and World Growth were mailed. Although the postage log does not reflect that letters were mailed that day, the Court finds Mr. Miller's explanation that Valley Forge was in a rush to make sure that the letters were mailed sufficiently explains why there is no notation in the log. Furthermore, it is

undisputed that the letters were mailed, because 42% of the recipients responded to them by providing an excuse to the Court. That the World Growth Claim was incorrectly listed as "approved and undisputed" on an exhibit attached to an earlier Affidavit filed by Christopher Ewing is irrelevant, because Mr. Miller testified that the database was set up so that all claims for which proofs of claim and/or cure documentation was sent in *late* should have been on the August 27 letter recipient list. The Court finds that this error in Mr. Ewing's affidavit does not rebut that World Growth should have appeared on the August 27 letter recipient list. Nor does the existence of a March 14 letter which incorrectly stated that the World Growth claim had been approved. The parties and Valley Forge all acknowledge that many claims whose documentation was sent in late were initially approved by Valley Forge but were ultimately disallowed by the Court. Furthermore, World Growth was also listed as rejected by this Court in its January 14, 2000 order. *See id.* Accordingly, the Court finds that both World Growth and IFA were sent the August 27 letter.

Chase seeks to rebut the presumption of receipt that arises upon proof of mailing primarily through its denial of receipt and its protestation that it uses standardized procedures to process received mail. Pennsylvania courts suggest that mere denial of receipt, without more, is insufficient to rebut the presumption. *See Philadelphia Reserve Supply Co. v. Zarrelli*, No. Civ. A. 90–5680, 1993 WL 160119, * 4 (E.D.Pa. May 14, 1993); *Meierdierck v. Miller*, 394 Pa. 484, 147 A.2d 406 (1959); *Commonwealth of Pennsylvania, Dept. of Transportation v. Grasse*, 146 Pa.Cmwlth. 17, 606 A.2d 544, 545 (1991). A party may rebut a presumption by introducing evidence which would support a finding of the non-existence of the presumed fact. 10

Moore's Federal Practice 301.04[2] (2d ed.1987); *In re Yoder*, 758 F.2d 1114, 1118 (6th Cir.1985); *In re Dodd*, 82 B.R. 924, 928–929 (N.D.Ill.1987).

Chase relies heavily on the Sixth Circuit's decision in *In re Yoder*, which held that direct testimony of nonreceipt, in combination with evidence that standardized procedures were used to process received mail, was sufficient to rebut the presumption accorded a proper mailing. *Yoder*, 758 F.2d at 1118. *Yoder* further held that evidence that one addressee did not receive a notice supports the inference that another addressee did not receive the notice. *See Yoder*, 758 F.2d at 1121. *Yoder* reversed a bankruptcy court's finding that a claimant's claim was barred for failure to submit a proof of claim. The claimant contended that he had not received notice, and the Sixth Circuit held that non-receipt would be sufficient ground for excusable neglect. The claimant introduced evidence that only four of twenty product liability claimants had filed proofs of claim. The court held that this evidence, combined with testimony of nonreceipt, was sufficient to rebut the presumption of receipt. Chase argues that *Yoder* supports its contention that its own lack of records of receipt and routine mail processing procedures, along with the 42% response rate to the August 27 letter, rebuts the presumption of receipt that arises upon proof of mailing. However, this Court is unconvinced that such evidence here rebuts the presumption. First, as explained in this Court's earlier opinion, the Court finds it just as likely that the 42% response rate is due to carelessness of the claimants or their lack of an excuse as opposed to their failure to receive the August 27 letter. The Court does not agree with *Yoder* that the mere failure by one claimant to respond to a notice is evidence that the claimant did not receive

the notice; similarly, the failure of many claimants to respond does not constitute evidence that those claimants all did not receive the notice.

Furthermore, the Court remains unpersuaded by Chase's discussion of the circumstances surrounding the power outage at Valley Forge when the August 27 letters were mailed. In light of Mr. Miller's unequivocal testimony that he personally witnessed the completion of the hand addressing of the envelopes, and that the lighting in the conference room where the letters were addressed was sufficient to complete the work, the Court finds that the circumstances of the power outage do not refute that the August 27 letters were in fact received. Moreover, the August 5 letters were admittedly received by Chase, although they were stamped by the Class Action Group on November 15, 1999. The evidence that Chase claims it did not receive two letters regarding the CIB claim at all, admits that it received the two request to cure letters for IFA and World Growth late, and admits that it received all three August 5 letters but did not receive them at its Class Action Group until November 15—more than three months after they were mailed—convinces the Court that Chase's own internal mail handling procedures were insufficient to deal with incoming mail. The existence of routine mail handling procedures at Chase cannot rebut the presumption of receipt because the number of letters lost or received late indicates that the internal mail handling procedures were deficient. Moreover, the circumstances of the power outage do not constitute the failure to follow established office procedures, because Valley Forge adopted a new office procedure to deal with the outage: namely, its employees addressed the remaining envelopes by hand in a well-lit room and used a computer-generated database of intended recipients. The failure to keep the list or to be able to reproduce a copy of it now does not negate that this procedure was followed and the August 27 letters appear in the files of IFA and World Growth.

Because of Chase's deficient internal mail handling procedures, the Court concludes that Chase is solely to blame for its failure to receive the August 27 letters and CIB request to cure and disallowance letters, and for its late receipt of the initial request to cure letters for World Growth and IFA. Neither Lead Counsel nor Valley Forge—or, for that matter, the U.S. Postal Service—are to blame for the late cures of World Growth and IFA claims and for Valley Forge's rejection of the CIB claim.

## FINDINGS OF FACT

### I. Background

1. Chase Manhattan Bank ("Chase") has moved under Rule 60(b) of the Federal Rules of Civil Procedure to vacate the Court's January 14, 2000 order disallowing claims to participate in a settlement of a portion of this action (the "PRIDES Settlement") submitted by Chase on behalf of three mutual funds for which Chase acted as custodian—(a) the Income Fund of America account ("IFA"), (b) the World Growth Fund ("World Growth"), and (c) the Capital Income Builder Fund ("CIB").

2. Cendant was named as a defendant in this action brought by a class of persons who purchased certain Cendant investment units known as "PRIDES." Cendant was formed on or about December 17, 1997, through the merger of HFS Incorporated with and into CUC International Inc. ("CUC"). *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 146 (D.N.J.1998).

3. The plaintiff class (the "PRIDES class" or "Plaintiff class") consists of persons who purchased PRIDES between February 24, 1998, when Cendant issued a total of 29,900,000 PRIDES pursuant to a

registered public offering, and August 29, 1998. This Court appointed Welch & Forbes as lead plaintiff in this action ("Lead Plaintiff"), and the law firm of Kirby, McInerney & Squire LLP as lead counsel ("Lead Counsel").

4. The Plaintiff class alleged claims under the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), and invoked the jurisdiction of this Court under 15 U.S.C. §§ 77v(a) and 78aa and 28 U.S.C. §§ 1331 and 1337. (JA at 82–83).

5. In an order dated June 15, 1999, the Court approved the settlement of a portion of this action (the "Settlement"), namely claims brought by purchasers of PRIDES on or before April 15, 1998, when Cendant issued a press release (after the close of business that day) disclosing that it had discovered accounting irregularities at business units of CUC.

6. By orders dated October 21, 1999 (JA at 7) and January 14, 2000 (JA at 23), the Court made determinations regarding the validity of settlement claims of certain class members, including Chase. In an Order dated February 22, 2000 (JA at 38–39), the Court certified its previous orders dated October 21, 1999 and January 14, 2000 as final under Rule 54(b) of the Federal Rules of Civil Procedure. Chase did not appeal from any of the Court's October 21, 1999, January 14, 2000 or February 22, 2000 orders.

7. On April 24, 2000, Chase moved under Rule 60(b) of the Federal Rules of Civil Procedure to vacate the Court's January 14, 2000 Order. (JA at 912–13.) By Order dated June 7, 2000, the Court de-

nied Chase's motion. (JA at 42–43.) On June 12, 2000, Chase filed a notice of appeal from this June 7, 2000 Order. (JA at 5.)

8. On December 1, 2000, the United States Court of Appeals for the Third Circuit remanded Chase's appeal to this Court, and directed that this Court provide additional factual findings and conclusions of law with respect to Chase's motion for Rule 60(b) relief under the excusable neglect standard. *In re Cendant Corp. PRIDES Litig.*, 234 F.3d 166 (3d Cir. 2000).

## II. The Settlement

9. The terms of the Settlement are contained in a Stipulation and Agreement of Compromise and Settlement (the "Stipulation") dated March 17, 1999. (JA at 331–369) In connection with the Settlement, the parties also prepared, and the Court subsequently approved, a notice of class action settlement to be distributed to the class (the "Notice") and a Proof of Claim form (*id.* at 391–412) to be completed by those class members who wished to receive a distribution under the settlement. *In re Cendant Corp. Prides Litig.*, 51 F.Supp.2d at 540.

10. In the Stipulation, Cendant agreed, in exchange for a dismissal and release of all claims based on purchases of PRIDES made on or prior to April 15, 1998, to distribute to each class member who did not opt out and who submitted a valid and timely Proof of Claim one "Right" with a theoretical or stated value of $11.71 for each PRIDES held at the close of business on April 15, 1998.[13] (JA at 365, Stipulation

---

13. Because the "Rights" were set to expire on February 4, 2001, the parties required time to submit the affidavits of Mr. Kenneth Gross and Mr. Michael Miller and later required additional time to take the depositions of Mrs. Gross and Miller, the Court entered an order

dated February 7, 2001 which provided that if Chase ultimately is allowed to participate in the settlement on behalf of any of the three funds, Chase would receive instead an equivalent amount of Cendant common stock.

§ VIII; *see also* JA at 397, 402, Notice ¶¶ 33, 70) Claims based on purchases made *after* April 15, 1998 are explicitly excluded from the Settlement. (JA at 342, Stipulation ¶ (I)(30), at 12)

11. The Stipulation provided that the Rights would be listed for trading on the New York Stock Exchange, enabling holders to sell them, and that Cendant will issue "New PRIDES" with more favorable terms than the PRIDES (*i.e.,* the right to receive more shares of Cendant common stock upon conversion) to persons who submit to Cendant specified quantities of Rights and PRIDES.

12. The Stipulation also provided that all unclaimed Rights—defined as "Rights as to which a timely and valid Proof of Claim has not been filed" (JA at 343, Stipulation ¶ (I)(37), at 13)—would be cancelled and thus not distributed.

### III. The Proof of Claim Process

13. The Stipulation also provides that Proofs of Claim were required to be filed no later than the "Deadline" (JA at 353, Stipulation ¶ (II)(B)(4), at 23), defined in the Stipulation as "the date set forth in the Notice [*i.e.,* June 18, 1999] by which all Proofs of Claim must be filed to be considered timely." (*Id.* at 339.)

14. The Stipulation also contains provisions concerning the supporting documentation required to accompany a Proof of Claim, *i.e.,* brokerage statements or other records maintained in the ordinary course of business demonstrating PRIDES ownership as of April 15, 1998. (JA at 351–355, Stipulation § II(B); JA at 409, Proof of Claim at 2.)

15. Under the Stipulation, if a Proof of Claim is filed by June 18, 1999 but is supported by insufficient documentation or otherwise defective, Valley Forge Administrative Services (the "Settlement Adminis-

trator")—an entity retained by Lead Counsel to review the Proofs of Claim (JA at 342, Stipulation ¶ (I)(32), at 12)—is required to offer any such claimant the opportunity to rectify the deficiencies (a "Request to Cure"). (JA at 354, Stipulation ¶ (II)(B)(6), at 24.)

16. The Stipulation expressly sets forth that a claimant must respond to a Request to Cure within 20 days of the date of such Request to Cure and specifies the consequences of failing to comply with that 20–day time period. (JA at 354, Stipulation ¶ (II)(B)(6), at 24.)

17. In March 1999, the Court granted preliminary approval of the Settlement. At that time, the Court also authorized dissemination of the Notice and Proof of Claim form to class members. (JA at 380–381, March 17, 1999 Order ¶ (4)(h), at 6–7.)

18. At no time did the Stipulation of Settlement provide that Lead Counsel were required to notify late claimants and late cure claimants of the need to supply an excuse to the Court for the late claims and/or cures. At no time did the Court require Lead Counsel to send such a letter. Instead, Valley Forge and Lead Counsel together persuaded Cendant to agree to this procedure, on the understanding that Cendant was planning to object to approval of any claims for which the proofs of claim and/or cure documentation was supplied late.

### IV. Chase's Proof of Claim Forms

19. As a threshold matter, the Court notes that Chase erroneously submitted 145 Proofs of Claims in respect of accounts for which Chase held Cendant *common stock*. However, claims with regard to common stock were not entitled to participate in this *PRIDES* Settlement. Chase concedes this error on its part, and also admits that all 145 of these Proofs of Claim "were properly denied." (Chase Br.

at 7 n. 5.) The Court also notes that Chase admittedly received all 145 rejection letters from the Settlement Administrator with regard to these common stock accounts, which bolsters the Court's findings below that the Settlement Administrator, in accordance with standard mailing procedures, properly mailed notices to Chase with regard to the three accounts for which it held PRIDES at issue on this motion.

### A. The CIB Claim

20. On June 4, 1999, Alex Marangelli, a Second Vice President of Chase, submitted a Proof of Claim on behalf of CIB, claiming ownership of 363,700 PRIDES. (JA at 947–54) The Settlement Administrator marked the CIB claim with the control number 7756. (JA at 1103–1104.)

21. The documents accompanying the CIB claim consisted of a one-page chart reflecting, by a handwritten entry, a March 2, 1998 purchase of 363,700 PRIDES and two one-page computer print-outs showing March 2, 1998 purchases of 36,300 and 363,700 PRIDES through Merrill Lynch for the account of CIB. (JA at 952–954.) Chase, however, did not supply any document to prove that CIB held PRIDES as of April 15, 1998.

22. Accordingly, on July 19, 1999, the Settlement Administrator mailed by first class mail to Chase, at the P.O. Box designated by Chase itself on the Proof of Claim form, a Request to Cure.[14] (JA at 1103–05.) In the Request to Cure, the Settlement Administrator advised Chase that it had submitted "Insufficient Account Information" for the CIB claim because "[y]ou did not send Claim Documentation for Ownership of Prides on 4/15/98." (JA

at 1050.) The Request to Cure also informed Chase that it had 20 days from the date of the Request to Cure in which to respond:

> NOTE: Please supply the omitted item(s) and return the information, along with this letter, to the address above. The forms you return to us must be postmarked no later than twenty (20) days from the date on this letter in order for your claim to be included in the Class.

(JA at 1050.) The Request to Cure also warned, in ordinary font (contrary to Chase's contention that the warning was in "non-prominent" print), that if not cured, "your claim will be deemed ineligible to participate in the distribution of the settlement fund." (*Id.*)

23. Chase admits that it did not respond to the July 19, 1999 Request to Cure its CIB claim. Chase claims that it did not receive the Request to Cure at its "Class Action Group," a group within the Chase organization responsible for dealing with matters pertinent to class action litigation such as this. The Court finds that, although Chase claims that its Class Action Group did not receive this Request to Cure, Chase received this Request to Cure in a timely fashion at the P.O. Box designated by Chase on the Proof of Claim form it submitted to the Settlement Administrator on behalf of CIB. The only evidence of non-receipt is Chase's denial of receipt and its contention that it has no record of receipt of the letter. As set forth in the Affidavit of Anthony Olszewski submitted by Chase, under Chase's internal mail distribution procedures, mail received at the P.O. Box designated on Chase's Proof of Claim form must pass through nine sepa-

---

14. Chase complains that the Settlement Administrator sent the Request to Cure on July 19, 1999, rather than on July 18 as it claims the Stipulation required. This Court takes

judicial notice of the fact that July 18, 1999 was a Sunday and that the United States Post Office does not provide regular mail service on Sundays. *See* Fed.R.Evid. 201(b).

rate levels or steps of distribution before it is received by the appropriate Class Action Group employee:

(1) Mail is picked up at the P.O. Box each business day by Chase's Transportation Department;

(2) The mail is then delivered to Chase's Mail Services Department;

(3) Mail Services then forwards each day's mail received in the P.O. Box to Chase's "Lock Box" area where it is opened by Chase Mail Service employees;

(4) In the Lock Box area, the mail is first sorted into two categories: incoming "check" mail and "non-check" mail;

(5) "Non-check" mail (i.e., notices, letters, etc.) is picked up each day at approximately 4:30 p.m. from the Lock Box area by USSO's Funds Clearance Unit:

(6) Between 4:30 and 7:00 p.m. each business day, the Funds Clearance Unit then sorts that day's mail for distribution to the five USSO groups: Corporate Actions; Class Actions; Proxy; Income Collection; and Receive and Deliver;

(7) Each of the five USSO groups, including the Class Actions Group, thereafter picks up its mail at the Funds Clearance Unit on a daily basis;

(8) Mail picked up for the Class Action Group is then time and date stamped by the individual group employee who opens its mail; and

(9) The mail is then distributed to the appropriate group employee for handling.

(JA at 1037–38, Olszewski Aff. ¶¶ 6–12).

24. Significantly, however, Chase's affidavits cannot establish that the Settlement Administrator's July 19, 1999 Request to Cure was not received by Chase in a timely manner at the P.O. Box designated by Chase on its Proof of Claim form.

25. Moreover, Valley Forge's affidavits establish that it was a regular procedure to keep a copy of letters sent to a claimant in that claimant's file. The July 19, 1999 Request to Cure letter appears in Valley Forge's Chase CIB file. The Court finds that this is sufficient evidence, when combined with the affidavits which establish the regular mailing procedures at Valley Forge, to establish that the July 19, 1999 letter was mailed. Accordingly, Valley Forge letter is entitled to the presumption of receipt upon proof of mailing with regard to that letter.

26. The Court further finds that Chase's mere denials of non-receipt are insufficient to rebut the presumption of receipt of the July 19 letter, for the reasons stated in the more detailed discussion above.

27. On August 5, 1999, the Settlement Administrator mailed by first class mail to Mr. Marangelli of Chase a second Request to Cure the CIB claim (JA at 1103–05). The second Request to Cure stated:

> We recently contacted you regarding the Claim you filed in the Cendant PRIDES Securities Litigation. We have not received your response to our request for additional documentation that indicates holdings in Cendant PRIDES as of 4/15/98. The documentation you provided indicates all transactions but fails to indicate an account name. Please provide any additional documentation to show all transactions through 4/15/98 and the account for which the transactions occurred.

(JA at 1052)

28. This second Request to Cure the CIB claim was date-stamped "Received"

by Chase's Class Action Group on November 15, 1999. (JA at 1052) The Court finds that, due to Chase's internal mail system (JA at 1037–38, Olszewski Aff. ¶¶ 6–12), Chase has not established that the Settlement Administrator's August 5, 1999 letter was not received at the P.O. Box designated by Chase on its Proof of Claim form in a timely manner, well before November 15, 1999.

29. On August 17, 1999, having received no response from Chase to either of the two Requests to Cure the CIB claim, the Settlement Administrator prepared a Notice of Disallowance addressed to Chase (JA at 1103–05), which stated that "[T]he [CIB] Claim did not contain supporting documentation for the ownership of the 363,700 PRIDES as of April 15, 1998." [15] (JA at 1051.) The Notice of Disallowance also advised Chase that, within 20 days of the date of the Notice of Disallowance, it could request a hearing before the Court to challenge the rejection of the CIB claim:

> You have the right to seek review of this decision rejecting your claim by the United States District Court that has jurisdiction over this lawsuit. You must file such a request with the Court within twenty (20) days from the date of this rejection notice, setting forth the reasons why you believe you are entitled to be included within the Class and/or why the rejection of your claim was improper.

(JA at 1051.)

30. As with the two Requests to Cure, based on the affidavits submitted by the Settlement Administrator (JA at 1100–06,

1243–45), the Court finds that the August 17, 1999 Notice of Disallowance of the CIB claim was sent by first class mail to Chase, at the P.O. Box designated by Chase on the Proof of Claim form, in accordance with the Settlement Administrator's normal mailing procedures.

31. Although Chase denies that its Class Action Group received this August 17, 1999 Notice of Disallowance from the Settlement Administrator, Chase's mere denial does not rebut the presumption that Chase itself received this August 17, 1999 letter at the P.O. Box Chase designated on its Proof of Claim form. Therefore, the Court finds that Chase did in fact receive the Notice of Disallowance and that, due to Chase's own fault, Chase lost this letter as a result of its internal mail distribution procedures.

32. In summary, the Court finds that Chase received the July 19, 1999 Request to Cure, the August 5, 1999 Request to Cure and the August 17, 1999 Notice of Disallowance of the CIB claim in a timely manner following mailing thereof by the Settlement Administrator. Because of the failure of its internal mail system, Chase alone is to blame if its Class Action Group did not actually receive these letters or received them months after mailing.

### B. Income Fund of America and World Growth Claims

33. On June 7, 1999, Mr. Marangelli of Chase submitted Proof of Claim forms on behalf of IFA, with regard to 1,400,000 PRIDES, and World Growth, with regard

---

15. Chase contends that the Settlement Administrator rejected the CIB claims because it universally rejected all claims that were supported with documentary evidence in the form of computer printouts. The Court rejects this contention and finds that the Settlement Administrator rejected Chase's CIB claim because the documentation provided with this claim failed to prove ownership of PRIDES as of April 15, 1998, as required by the Settlement. (JA at 1050–51.) For this same reason, the Court rejects Chase's contention that its CIB claim, as initially submitted, was valid and should have been accepted by the Settlement Administrator.

to 220,000 PRIDES. The Settlement Administrator assigned control number 7807 to the IFA claim and control number 8259 to the World Growth claim. (JA at 955–71, 1103–04.)

34. With regard to the IFA claim, the documentary proof submitted by Chase consisted of a one-page chart reflecting, by handwritten entries, two purchases on March 2, 1998 of a total of 1,400,000 PRIDES, and two one-page computer print-outs showing two purchases on March 2, 1998 of 1,400,000 PRIDES through Merrill Lynch for the account of IFA. (JA at 960–62.)

35. The documentary proof for the World Growth claim consisted of a one-page chart reflecting, by handwritten entries, three March 1998 purchases and one April 28, 1998 purchase of a total of 300,-000 PRIDES and three one-page computer print-outs showing the purchases of PRIDES through Merrill Lynch for the "World Growth and Income" account.[16] (JA at 960–62.)

36. As with the CIB Proof of Claim, Chase failed to comply with the requirement of the Proof of Claim that Chase submit documentation establishing that IFA and World Growth held PRIDES at the close of business on April 15, 1998.

37. Accordingly, on July 15, 1999, the Settlement Administrator mailed to Chase, by first class mail to the P.O. Box designated by Chase on each Proof of Claim, a Request to Cure in respect of each of the IFA and World Growth claims, advising that Chase had submitted "Insufficient Account Information," and "did not send Claim Documentation for Ownership of Prides on 4/15/98."[17] (JA at 990–91.) Each Request to Cure set forth the deadline in which to respond and warned in bold-faced print that if not cured, "your claim will be deemed ineligible to participate in the distribution of the settlement fund." (*Id.*)

38. On July 16, 1999, the Settlement Administrator mailed to Chase, by first class mail to the P.O. Box designated by Chase on each Proof of Claim, a second Request to Cure the IFA claim, which stated, *inter alia:*

> Proper documentation will indicate that you owned the Prides as of 4/15/98 through with which firm your trades were made. The best source for this information will be a monthly statement for April that shows you held prior to the 15th of April *and did not sell the Prides during the Class Period. If a monthly statement is not available we also will accept a letter from your broker/trader or another third party.* The letter needs to indicate that the PRIDES were purchased during the Class Period, the number purchased, the amount paid, and also that they were held as of April 15, 1998.
>
> *Should the above listed sources of documentation not be available we are also permitted, as set forth in the "Proof of Claim Form, Settlement and Release"*

---

16. The April 28, 1998 purchase was not eligible for participation in the Settlement, which covered only purchases of PRIDES through April 15, 1998.

17. The Court rejects the contention that the Settlement Administrator rejected the IFA and World Growth claims because they were supported by documentation in the form of computer print-outs. The Settlement Administrator initially rejected Chase's IFA and

World Growth claims because the documentation provided failed to prove ownership of PRIDES as of April 15, 1998, as set forth in the Request to Cure. (JA at 990–91, 1015–16, 1240) For this same reason, the Court rejects Chase's contention that its IFA and World Growth claims, as initially filed, were valid and should have been accepted by the Settlement Administrator.

*previously sent to you, to accept "...
business records maintained in the ordinary course of business confirming
your holdings of Cendant Prides listed
in your Proof of Claim."*

(JA at 1240) (bold in original) (emphasis added).

39. The Settlement Administrator sent to Chase this July 16, 1999 second Request to Cure the IFA claim to ensure that this large institutional claimant would submit sufficient documentation for its claim with regard to 1.4 million PRIDES. (JA at 1244, May 25 Ewing Aff. ¶ 3.)

40. On August 5, 1999, the Settlement Administrator mailed to Chase, by first class mail, to the address designated by Chase on the Proof of Claim form Chase had submitted, a third Request to Cure the IFA claim and a second Request to Cure the World Growth claim. (JA at 1015–16.)

41. These August 5, 1999 letters from the Settlement Administrator were date-stamped "Received" by Chase's Class Action Group on November 15, 1999. (JA at 1015–16.) The Court finds that, although Chase's Class Action Group may not have received the August 5, 1999 letters until November 15, 1999, Chase received these August 5, 1999 letters at the P.O. Box it designated on the Proof of Claim form in a timely manner, long before November 15, 1999.

42. The Court also finds that, if the delivery to the Class Action Group of the August 5, 1999 letters was delayed, such delay was caused by Chase's internal mail distribution procedures. (*See* JA at 1037–38, Olszewski Aff. ¶¶ 6–12.)

43. On August 12, 1999, 28 days after the Settlement Administrator's initial July 15, 1999 Requests to Cure the IFA and World Growth claims, Chase responded to them. Chase sent by facsimile to the Set-

tlement Administrator signed Request to Cure forms and additional documents. (JA 1005–14.) The July 15, 1999 Requests to Cure forms returned to the Settlement Administrator by Chase were date-stamped "Received" by Chase's Class Action Group on July 28, 1999. (JA at 990–91, 1006, 1008; *see also* JA at 1048, April 19, 2000 Facsimile from Settlement Administrator ¶ 3.) Again, the Court finds that, any delay to July 28, 1999 in the delivery to the Class Action Group of the July 15, 1999 Request to Cure is the result of Chase's internal mail distribution procedures. (*See* JA at 1037–38, Olszewski Aff. ¶¶ 6–12.) Accordingly, the cure documentation was filed eight days late, or four days past the deadline if the Court's additional four-day grace period is considered.

44. Chase claims that it attempted to cure its IFA and World Growth claims only after the 20–day cure period for doing so had passed because the Chase Class Action Group employee responsible for responding to the Requests to Cure, Heather Collins, was confused by them. Chase's argument that Ms. Collins could not respond to the Requests to Cure the IFA and World Growth because she found them confusing and her supervisor was out of the office does not withstand scrutiny. Ms. Collins admitted understanding that "the instructions included with the Proof of Claim form permitted the submission of 'business records maintained in the ordinary course of business confirming your holdings of Cendant PRIDES.' " (JA at 1033.) Nor does Chase explain why she could not contact Mr. Marangelli, as Second Vice President, who had signed and submitted to the Settlement Administrator the initial Proofs of Claim for IFA and World Growth.

45. In addition, under the express terms of the Stipulation and the Notice, Chase had the option of contacting the

Settlement Administrator and "explain[ing] why substantial compliance [with the 20–day Request to Cure deadline] cannot be made." (JA at 354; at 402, Notice ¶ 74.) Ms. Collins, a claims administrator at a large and sophisticated financial institution such as Chase, could and should have contacted the Settlement Administrator to explain why she could not comply with the deadline and ask for clarification of the Requests to Cure. Therefore, the Court finds that the delay in responding to the Requests to Cure is the fault of Chase, not the Settlement Administrator, Lead Counsel, or Cendant.

46. After receiving Chase's August 12, 1999 responses to the Requests to Cure the IFA and World Growth claims, the Settlement Administrator approved these two claims.

47. However, on August 27, 1999, the Settlement Administrator mailed by first class mail, to the P.O. Box designated by Chase on the Proof of Claim forms it submitted on behalf of IFA and World Growth, letters to Chase in respect of the IFA and World Growth claims (JA at 1103–05). In pertinent part, each letter stated that:

> The claim you filed was either received by Valley Forge Administrative Services, Inc. ("VFAS") after the deadline for filing or your response to the cure notice was received after the 20–day allowable period.

> VFAS and class counsel believe that your claim should be accepted as valid. Cendant Corporation's Counsel may object to your claim being approved by the Court.

> \* \* \* \* \* \*

> *We urge you to write the Court explaining why the form was submitted after the June 18, 1999 deadline, or why the*

*cure notice was completed and submitted when it was.*

*Your letter must be received by the Court by September 6, 1999 ...*

(JA at 1102, 1104, May 9, 2000 Ewing Aff. ¶¶ 6, 13) (emphasis added).

48. Chase neither responded to these letters nor sent any explanation to the Court. Again, Chase asserts that its *Class Action Group* did not receive the August 27, 1999 letters with regard to the IFA and World Growth claims. In this regard, Chase also argues that 58% of other claimants to whom the Settlement Administrator states he mailed an August 27 letter, like the IFA and World Growth August 27 letter, also did not respond, and therefore the Settlement Administrator's sworn statements concerning the mailing of such letter to Chase should be rejected.

49. As stated in this Court's earlier opinion, the Court rejects Chase's contention. An explanation far more plausible than Chase's speculation concerning the silence of other claimants is that 58% (assuming solely for argument that Chase's calculations are accurate (JA at 1154–56)) of PRIDES claimants did not respond to the August 27 letter because those claimants simply had no excuses for their late claims or cures.

50. Chase also contends that circumstances surrounding the Settlement Administrator's mailing of the August 27 letters demonstrate that Chase did not receive these letters. The Court finds that even if 40% of the total number of August 27, 1999 letters were addressed by hand (as a result of a power outage at the Settlement Administrator's office), it does not support Chase's contention that it did not receive these August 27 letters with regard to the IFA and World Growth claims. First, Chase has offered no proof that the August 27 letters with regard to the IFA and World Growth claims were included in the 40% ad-

dressed by hand, rather than the 60% that were addressed with computer generated labels. Second, Chase has offered no proof that, even were its August 27 letters hand-addressed, they were addressed incorrectly. Third, the Court finds that the August 27 letters sent to Chase were not returned to the Settlement Administrator as undeliverable, which would have occurred if those letters were not addressed properly. (JA at 1105.) Finally, as discussed in more detail above, the Court finds that Mr. Miller's testimony that he personally witnessed the hand-addressing of the August 27 letters, combined with the fact that copies of the letters appear in Chase's IFA and World Growth files, is sufficient to establish a rebuttable presumption that the letters were mailed. Nor do Chase's mere denials of receipt rebut that presumption.

51. Accordingly, the Court finds that, based on the affidavits submitted by the Settlement Administrator (JA at 1100–06, 1243–45), the August 27, 1999 letters were mailed to and received by Chase in accordance with normal mailing procedures. (JA at 1243, May 25, 2000 Ewing Aff. ¶ 2.) If those letters were not received by Chase's Class Action Group, it is due to Chase's internal mail distribution procedures and not due to any neglect by the Settlement Administrator, Lead Counsel or Cendant.

## V. Cendant's September 7, 1999 Motion For an Order Disallowing Untimely and Deficient Proofs of Claim

52. On September 7, 1999, Cendant moved the Court for an order disallowing claims, including Chase's IFA and World Growth claims, that had been allowed by the Settlement Administrator but were, according to Cendant, not timely cured. The CIB claim was not included in Cendant's motion because this claim had been rejected by the Settlement Administrator.

53. In its motion, Cendant argued that the terms of the Stipulation, along with the Court's March 17, 1999 Order, the Notice, and the Proof of Claim, mandated that untimely cures be disallowed by the Settlement Administrator. (JA at 9–10.)

54. In response to Cendant's motion, Lead Counsel cross-moved on behalf of the PRIDES class, including Chase, for an order enlarging the time to file Proofs of Claim and responses to Requests to Cure pursuant to Rule 6(b)(2) of the Federal Rules of Civil Procedure. (JA at 8.)

55. Chase contends that Cendant's motion was untimely because it should have been filed on September 6, 1999, which was twenty days after the August 17, 1999 deadline for the Settlement Administrator to distribute Notices of Disallowance, according to Chase's reading of the Stipulation. Because this contention was not made by Chase in its Rule 60(b) motion as initially filed, the Court will not address it now.[18]

## VI. This Court's October 21, 1999 Decision

56. On October 21, 1999, this Court issued an opinion and order denying Cendant's motion and granting Lead Counsel's

---

18. Even if the Court were to consider this argument, it would finds that Cendant's motion was timely. Monday, September 6, 1999 was Labor Day, and the Court was closed in observance of this national holiday. Accordingly, the Court finds that Cendant could not have filed the motion on Monday, September 6, and that Cendant's filing on Tuesday, September 7 was timely under the Federal Rules of Civil Procedure. Moreover, Chase alleges no prejudice from Cendant's filing of its motion to disallow Proofs of Claim on September 7, 1999.

cross-motion. (JA at 8–22.) The Court determined that "the appropriate standard under which any request to allow tardy proofs of claim or requests to cure should be analyzed is the excusable neglect standard of [Federal] Rule [of Civil Procedure] 6(b)2." (JA at 12.)

57. The Court deferred ruling on the individual disputed claims until it could examine each late claim to determine whether the delay in filing or curing was caused by "excusable neglect," and directed Lead Counsel to provide the Court with the reason that each late claimant had provided by September 7, 1999 for its late filing or curing. (JA at 19–20.)

58. The Court did not intend to accept, and in fact did not accept, any excuses for late claims or late cures that had been submitted after September 7, 1999. Consequently, this Court neither required nor requested that Lead Counsel solicit excuses after the October 21 Order was entered. Lead Counsel was under no duty after this Court's October 21, 1999 decision to seek explanations or excuses from Chase or any other claimant for its late cures. Neither Lead Counsel nor Valley Forge are at fault for Chase's failure to provide excuses for the World Growth and IFA claims. Third Circuit correctly stated in its first Prides opinion that the "October 21 decision made clear that it would consider only information that claimants had supplied prior to the extended cut-off date of September 7, 1999." *Prides I*, 233 F.3d 188, 191–92. Therefore, the Court finds as a matter of fact that Lead Counsel was not obligated to elicit any explanations or excuses from Chase on or after October 21, 1999 because the time had already passed

for Chase to submit to the Court any such explanations or excuses.

59. On November 12, 1999, Lead Counsel filed a brief on behalf of all late claimants, including Chase. In its submission, Lead Counsel represented, accurately, that no explanation had been provided for Chase's untimely cures of the IFA and World Growth claims.[19] (JA at 618.)

## VII. Chase's January 4, 2000 Submission to the Settlement Administrator

60. By envelope postmarked January 4, 2000 (JA at 1055), Chase responded to the Settlement Administrator's August 5, 1999 supplemental Requests to Cure all three of Chase's claims (CIB, World Growth, and IFA). (JA at 1052–55.)

61. The Court finds that Chase received in a timely manner the August 5, 1999 Requests to Cure at the P.O. Box it designated on each Proof of Claim form, and that, if Chase's *Class Action Group* did not receive these August 5, 1999 Requests to Cure until November 15, 1999, the delay is due solely to Chase's internal mail distribution system. (JA at 1048, 1052–54; *see also id.* at 1017.)

In its January 4, 2000 submission, contrary to its original submissions to the Settlement Administrator, Chase claimed that the IFA account owned 1,425,000 PRIDES as of April 15, 1998, instead of the 1,400,000 originally claimed. (JA at 1053.) Chase also claimed that the World Growth account owned 300,000 PRIDES as of April 15, 1998, despite the fact that its original Proof of Claim showed purchases of only 220,000 PRIDES before that date. (JA at 1054, 968.)

---

19. Lead Counsel erroneously referred to the IFA account as the "Investment Compa[n]y of America" claim, but cited the proper control number for, and the correct number of

PRIDES allegedly owned by, the IFA account: 7807 and 1,400,000 PRIDES, respectively. (JA at 618.)

62. By making this supplemental submission, Chase clearly evidenced its understanding that it was required to demonstrate PRIDES holdings *as of April 15, 1998* in order to participate in the Settlement.

63. The Court also finds that Chase, in its original Rule 60(b) motion, failed to inform the Court of its January 4, 2000 submissions in response to the Settlement Administrator's Requests to Cure all three Chase claims, apparently because only negative inferences could be drawn from such submissions, including (1) the delays inherent in Chase's internal mail distribution procedures, (2) Chase's awareness that all three of its claims were still in jeopardy of being rejected as late as early January 2000, (3) Chase's ability to submit documentation other than brokerage statements showing PRIDES ownership as of April 15, 1998, and (4) that other Chase Class Action Group employees besides Ms. Collins were responsible for curing Chase's claims, namely Mr. Alex Marangelli.

## VIII. The Court's January 14, 2000 and February 22, 2000 Orders

64. On January 14, 2000, the Court issued an order allowing certain Proofs of Claim challenged by Cendant and disallowing others. (JA at 23–37.)

65. The Court disallowed Chase's IFA and World Growth claims on the ground that Chase had provided "[n]o excuse" for its late cures of those claims. (JA at 32, January 14, 2000 Order, Claim Nos. 7807 and 8259.)

66. Immediately following receipt of the Court's January 14, 2000 decision, Lead Counsel prepared a letter to Chase dated January 17, 2000 describing the decision. (JA at 1022–27.)

67. The January 17 letter informed Chase that the Court had disallowed the IFA and World Growth claims. In the letter, Lead Counsel explained to Chase that any distribution of Rights to class members would be delayed if Lead Counsel were to appeal the Courts decision, that this delay would be contrary to the interest of the members of the class whose claims were not in dispute, and that therefore Lead Counsel could not file an appeal on Chase's behalf. Accordingly, Lead Counsel advised Chase to consider retaining counsel, and offered to provide Chase or any counsel it retained with all documentation in Lead Counsel's possession relating to Chase's claims. (JA at 1023–24, January 17, 2000 letter from Kirby McInerney & Squire, LLP to Chase Investment Securities Inc.) The letter also described the efforts that Lead Counsel had made to secure approval of the challenged claims, and described the Court's decisions. (*Id.*)

68. Lead Counsel determined to send the January 17 the letter by Federal Express to expedite, and obtain written confirmation of, Chase's receipt of the letter. (Edgar Decl. ¶¶ 3–4).

69. The Circuit directed this Court to determine whether it was reasonable for class counsel to have sent the January 17 notification letter by Federal Express to the Brooklyn address, instead of to the designated P.O. Box by mail, whether Federal Express delivers to P.O. Boxes, and whether it was reasonable for class counsel not to have faxed the January notification letter in addition to the copy sent by Federal Express.

70. First, the Court finds that Federal Express does not deliver to post office boxes. (Edgar Decl. ¶¶ 2–3.) In this case, the Court also finds that delivery to the P.O. Box designated by Chase was not practicable because a signature understandably was required to evidence

Chase's receipt of this important letter. (Edgar Decl. ¶ 4.)

71. Furthermore, the Court finds that it was reasonable for Lead Counsel to send the notification letter by Federal Express. Cendant submits the Declaration of Pamela Edgar, a paralegal at the firm of Kirby McInerney & Squire, LLP, Lead Counsel for the Prides Class ("Edgar Decl."). Ms. Edgar declares that at Mr. Kirby's request, she originally sent the January 17, 2000 letter to Chase's P.O. Box by Federal Express. However, because Federal Express does not deliver to P.O. Boxes, the letter was returned. After she received the return envelopes, she called Chase and asked to speak to Mr. Marangelli, but was advised he was unavailable. In response, she advised the Chase representative of the need to immediately notify Chase of the Court's order, which she described, and wanted Chase to receive the letter as soon as possible. The Chase representative then instructed Ms. Edgar to send the letter by Federal Express to Mr. Ronald Puddie, Special Services, at a Chase address in Brooklyn. (*See* Edgar Decl. ¶ 3.) Ms. Edgar followed these instructions. (*Id.*) Mr. Puddie signed for the Federal Express package on January 24, 2000. (JA at 1026–37; JA 943.) Chase admits that it received the letter, and that the letter was "lost": "That letter cannot be located and it was apparently lost in transit when it was forwarded to Ms. Collins whose section is responsible for following up on any problem with class action filings . . ." (JA 943.)

Lead Counsel's actions were reasonable in light of the need to forward the information in the January 17 letter quickly. Lead Counsel contacted Chase and followed its directions. Chase admits that it, and it alone, lost the letter in transit. That Federal Express was not the origi-

nally chosen method of delivery does not alter Lead Counsel's diligence in its efforts to deliver the January 17 letter. As Cendant points out, it is also irrelevant that the letter was sent via Federal Express instead of to the regular P.O. Box because Chase received the letter and lost it. Furthermore, it is not clear to this Court that Chase would have correctly routed the letter had it been sent to the P.O. Box, in light of the number of letters which were lost and/or delayed by Chase.

72. Chase complains that Lead Counsel failed to fax the January 17, 2000 letter to Chase's Class Action Group (Chase Br. at 18.) However, this Court finds no reason why Lead Counsel should have faxed the letter in addition to sending it by Federal Express. To require a letter sent by Federal Express to be faxed in addition is nothing more than a hindsight attempt to place the blame at the feet of Lead Counsel. Because Lead Counsel followed Chase's instructions, the Court finds that it was reasonable for Lead Counsel not to have faxed the letter.[20]

73. On February 22, 2000, the Court directed that its October 21, 1999 and January 14, 2000 orders regarding the disputed Proofs of Claim be entered as final and appealable judgments pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. (JA at 38–39).

74. Despite Chase's admission that it had received Lead Counsel's January 17, 2000 letter, at the location where Chase directed that it be sent, Chase did not appeal from the Court's January 14 and February 22, 2000 orders.

## IX. Chase's Rule 60(b) Motion and this Court's June 7, 2000 Order

75. In early April 2000, Chase requested information regarding the denial of its

---

**20.** Accordingly, although Chase makes much of the issue of whether and when Lead Coun-

sel had Chase's correct fax number, the Court does not need to address that issue.

claim from Lead Counsel (JA at 1022), and Lead Counsel immediately provided Chase with another copy of his January 17, 2000 letter. (JA at 1022–27.)

76. On April 17, 2000, Chase's in-house counsel contacted the Settlement Administrator and requested certain information pertaining to its claims. On April 19, 2000, the Settlement Administrator provided Chase with copies of the requested documents. (JA at 1045–56.)

77. On April 24, 2000—over 3 months after Lead Counsel initially informed Chase of the Court's rejection of Chase's IFA and World Growth claims, and over 8 months after Chase knew that its CIB, IFA and World Growth claims were in jeopardy—Chase moved under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time to appeal from, and under Rule 60(b) of the Federal Rules of Civil Procedure for relief from, the Court's judgments and orders denying the claims to participate in the Settlement it had submitted on behalf of CIB, IFA and World Growth. (JA at 912.)

78. At the May 24, 2000 hearing on the Rule 60(b) motion, and in the June 7, 2000 opinion denying the motion, the Court found incredible and incapable of verification Chase's claims not to have received numerous mailings from the Settlement Administrator. (JA at 1273–1274, 1299.)

79. With regard to (1) the requirement that a Rule 60(b) motion must be filed within a reasonable time, and (2) the length of delay element of excusable neglect, the Court stated at the May 24 hearing that Chase had failed to offer any adequate excuse for taking so long to explain its failure to cure the CIB claim at all and its failure to explain its late cures of the IFA and World Growth claims. (JA at 1284–85.)

80. In the June 7, 1999 opinion, the Court also cited Chase's lack of diligence and "Chase's own deficiencies in handling the Cendant class action correspondence" as dooming its Rule 60(b) motion. (JA at 52–53.)

## CONCLUSIONS OF LAW

### I. Chase's Initial Proofs of Claim Were Not Valid

Chase asserts that its initial Proofs of Claim for the CIB, IFA, and World Growth claims should have been accepted as sufficient by the Settlement Administrator. The Court rejects this assertion.

As discussed in the Findings of Fact, the Proofs of Claim Chase submitted on behalf of CIB, IFA and World Growth were defective because neither was accompanied by proof of ownership of PRIDES *as of April 15, 1998.* This obvious and critical defect caused the Settlement Administrator to determine that Chase's claims could not be processed and to send Chase Requests to Cure, which informed Chase that it "had failed to supply Claim Documentation for Ownership of Prides on 4/15/98." (JA at 990–91, 1050, Requests to Cure.)

Contrary to Chase's contention, the Settlement Administrator did not reject Chase's claims because its documentary proof consisted of computer printouts. Chase's assertions are based on statements taken out of context from a dispute over another claimant's submission of *print-screen* printouts. (JA at 478, September 28, 1999 Zarocostas Cert. ¶ 3.)

There also is no merit to Chase's attempt to find shelter for its tardy responses to Requests to Cure under the legal doctrine of "substantial performance." Under New York law, to which the parties agreed in the Stipulation (JA 367), the doctrine of substantial performance does not apply to a failure to comply with a clear deadline. Here, the Stipulation, No-

tice and other settlement documents clearly required a response to a Request to Cure within twenty (20) days of a Request to Cure, as shown above. Because the deadline was unmistakably clear, the doctrine of substantial performance does not and cannot salvage Chase's late claims. *See Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, 420–21 (1995).

## II. Chase Is Not Entitled to Rule 60(b) Relief

### A. Standard for Rule 60(b) Relief

Rule 60(b) of the Federal Rules of Civil Procedure provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect.... The motion shall be made within a reasonable time, and [for motions under Rule 60(b)(1) ] not more than one year after the judgment, order, or proceeding was entered or taken.

Fed.R.Civ.P. 60(b)(1). The Supreme Court has emphasized that the inquiry is equitable and requires consideration of "all relevant circumstances surrounding the party's omission." *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

In *Pioneer*, the Supreme Court held that in assessing a claim of excusable neglect a court must consider (1) the reason for the delay, including whether it was in reasonable control of the movant, (2) the length of the delay and its potential impact on judicial proceedings, (3) whether the movant acted in good faith, and (4) the danger of prejudice to the non-movant. 507 U.S. at 395, 113 S.Ct. 1489; *see also In*

*re O'Brien Envntl. Energy*, 188 F.3d 116, 125 n. 8 (3d Cir.1999).

## B. Chase's Motion Pursuant to Rule 60(b) Was Brought Within a Reasonable Time

 "A [Rule 60(b) ] motion is not timely merely because it has been filed within one year of the judgment." *White v. American Airlines, Inc.*, 915 F.2d 1414, 1425 (10th Cir.1990). The one year period applicable to Rule 60(b)(1) is an outer limit, and a Rule 60(b) motion is subject to denial if it is not also made within a *reasonable time* after the basis for seeking some relief is known. *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986); 12 Moore's Federal Practice § 60.65[1] (3d ed.1998). This Court must measure the reasonableness of the delay in filing a Rule 60(b) motion by the date this Court's earlier decision became final, which was February 23, 2000. *See In re Cendant Corp. PRIDES Litig.*, 235 F.3d 176, 183–84 (3d Cir.2000) (*"Santander"*). Accordingly, the length of time between the date the decision became final and when Chase's Rule 60(b) motion was filed is approximately two months. In the Third Circuit's recent decision in *Santander*, the Third Circuit held that a three week delay in the filing of another Prides claimant's Rule 60(b) motion was "insignificant as a matter of law." *Id.* at 183–84. The *Santander* court stated that the Circuit had found in *O'Brien* that a two-month delay was insignificant as a matter of law. Under this standard set forth by the Third Circuit, the Court finds that Chase's delay in filing from the date this Court's decision became final was reasonable.

## III. Chase Has Not Demonstrated Excusable Neglect

██ Even though Chase's Rule 60(b) motion was timely, Chase has failed to

demonstrate excusable neglect for either the CIB claim or the IFA and World Growth claims.

### A. The CIB Claim

#### 1. Reason for the Delay

■ If the reason for the delay is not compelling, a court may still find no excusable neglect even if other factors weigh in favor of the movant. *Weinstock v. Cleary, Gottlieb, Steen & Hamilton,* 16 F.3d 501, 503 (2d Cir.1994) (although some factors favored movant there was inadequate reason for the delay, and this alone warranted finding of no excusable neglect); *In re Investors & Lenders, Ltd.,* 169 B.R. 546, 550 n. 4 (Bankr.D.N.J.1994). The analysis is qualitative, not quantitative, and must consider all relevant factors under the circumstances.

Chase has offered no justifiable reason why it waited eight months to explain its failure to cure the CIB claim. Instead, Chase blames the Settlement Administrator for Chase's Class Action Group allegedly not receiving both a July 19, 1999 Request to Cure and an August 17, 1999 Notice of Disallowance of the CIB claim. It also blames either the Settlement Administrator or the Post Office for its alleged late receipt of the August 5 second Request to cure, which was allegedly received by its Class Action Group on November. As stated above, the Court finds that, if these materials were not received (or were not received in a timely manner) by the Class Action Group, Chase alone is at fault. As a result, this factor weights heavily against Chase under the excusable neglect analysis of the CIB claim.

■ Unexplained misrouted mail does not constitute a reasonable excuse. In *Gibbs v. Air Canada,* 810 F.2d 1529 (11th Cir.1987), a plaintiff served a regional manager for Air Canada, who then for-

warded the complaint to its in-house counsel via interoffice mail. There, the Circuit held that the excuse offered by Air Canada, that its mail clerk must have misplaced the complaint, was not a sufficient excuse to justify relief under Rule 60(b) to vacate a default judgment. Similarly, in *Baez v. Kresge Co.,* 518 F.2d 349 (5th Cir.1975), the Fifth Circuit affirmed a district court's denial of Rule 60(b) relief, when the defendant had failed to respond timely to the plaintiff's complaint because it claimed the Postal Service had lost the papers. The defendant's agent there had received a copy of the summons and complaint, but the court found that the defendant had failed to establish appropriate procedural safeguards to ensure that the papers were successfully forwarded to its home office and had not established that its neglect was excusable. *Id.* at 350. *See also Rogers v. Hartford Life and Accident Ins. Co.,* 167 F.3d 933, 938–40 (5th Cir.1999) (assertion that a "reputable overnight package service" failed to deliver a complaint did not warrant relief).

Here, the only excuse which Chase offers is that it never received either the CIB request to cure or the rejection letter. It also offers no reason why its Class Action Group received the August 5 letter in November, but merely speculates that it must not have been mailed on August 5 or that the Post Office delivered it late. This Court has already concluded that Cendant and Valley Forge have established the rebuttable presumption of receipt that arises upon mailing for the CIB request to cure, rejection letter and the August 5 follow-up request to cure. The Court finds that those letters were received, and were received timely. If Chase's Class Action Group did not receive the August 5 letter until November, then it was because of Chase's failure to establish appropriate procedural safeguards to ensure that its internal mail was distributed properly.

Chase's loss and misrouting of these time sensitive letters cannot support a finding of excusable neglect under the present circumstances. The Fourth Circuit's analysis in *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 897 (4th Cir.1987), is instructive:

> The unexplained disappearance of the summons and complaint from [movant's] mail room does not constitute grounds for relief from the default judgment under Rule 60(b)(1). Because [movant] could give no reason for the loss of the complaint, the district court could not determine whether it had an acceptable excuse for lapsing into default. In the absence of any acceptable excuse for [movant's] default, the district court did not abuse its discretion in determining that [movant] had failed to demonstrate any mistake, inadvertence, surprise or excusable neglect that would justify relief from the default judgment under Rule 60(b)(1).

Furthermore, Chase admits that it received the August 5 Request to Cure the CIB claim. Thus, Chase knew by November 15, 1999 (by which time it admittedly received this August 5, 1999 Request to Cure) that the CIB claim was in jeopardy of being disallowed. However, Chase waited until January 4, 2000 before it attempted to cure the CIB claim.

Moreover, although Mr. Marangelli, one of at least two Chase Class Action Group employees responsible for the CIB claim, knew by early January 2000 that the CIB claim was in jeopardy, no one from Chase diligently followed up on the status of the CIB claim until April 2000. In fact, Chase offers no reason why Mr. Marangelli, who was in charge of Chase's proofs of claim in this action, was not immediately made aware of the letter when it was received in November 1999. Nor does Chase explain its failure to make itself aware of the rejection of its CIB claim when the August

5 letter was received in November. The August 5 letter indicated that the response was urgent, yet Chase's Class Action Group did not call Valley Forge to inquire as to the status of the CIB claim. Instead, Chase waited almost two months to return the form, and still did not follow up on that response. Chase relies solely on its unexplained failure to receive two vital letters and late receipt of a third letter. And as previously stated, this failure, if anyone's fault, was due to Chase's own internal mail handling procedures and not to any action or inaction on the part of Valley Forge, Lead Counsel or Cendant.

For this reason, the Third Circuit's determination in *Santander* that the claimant's belated discovery that large quantities of outgoing mail were discovered in the mail room, including the claimant's proof of claim in the *PRIDES* settlement, does not compel a contrary result. There, the "mail room sabatoge" theory was a concrete and reasonable explanation why the documentation was not sent out when it should have been. *See* 235 F.3d 176, 183–84. Although the Circuit characterized that theory as, more simply put, "a mailroom which did not operate as it should have in the ordinary course of business," *id.*, here Chase has established more than simply a malfunctioning mail room. Here, by contrast, Chase has no explanation why it allegedly never received certain letters. The utter lack of any reason, apart from speculation, results in *unexplained neglect.* In addition, although the Circuit observed that excusable neglect may still be established even if the circumstances are within the control of the movant, in *Santander*, the mail room sabatoge removed the claimant's control over the situation, while here, Chase fails to establish—beyond its speculation—that the circumstances were in any way out of its own control. More important, however, is that Chase had ample

opportunity to follow up on its claims, most notably when it received the August 5 second request to cure in November. After that, Chase did nothing for two months, without explanation, then forwarded the cure documentation, again without excuse, and did not follow up. This is more than simply a "mailroom that did not function as it should have in the ordinary course of business"; this was failure of at least the Second Vice President in charge of the claim to diligently monitor the claim. Furthermore, in *Santander*, the claimant attempted to send an excuse to the Court, but misinterpreted the letter because it was not yet aware of the "mail room sabatoge." *Id.* at 178–79. Instead of explaining why the claim was mailed late, Santander had mistakenly explained why the mail might have been received late, still under the assumption that the claim had been mailed timely. *Id.* The Court there found that misunderstanding to be reasonable. *Id.* at 180–81. Here, the only reason Chase failed to provide a proper excuse to the Court is its unexplained failure to receive the August 27 letters. However, Chase never attempts to explain any of its other delays. Santander also wrote to the Court to inquire as to the status of its claim in November 1999. *Id.* at 179–80. Here, Chase was aware of some problems with its claims in November as well, but unlike *Santander*, did nothing until its five-month late January response, and even then did not follow up. Chase's conduct does not measure up to Santander's diligence. Chase's *unexplained* neglect cannot constitute excusable neglect under these circumstances.

### 2. The Length of the Delay

Chase's eight-month delay in investigating the Settlement Administrator's rejection of its CIB claim (from August 17, 1999, when the Settlement Administrator mailed to Chase the August 17, 1999 Notice of Disallowance of the CIB claim, until April 24, 2000, when Chase brought its Rule 60(b) motion in respect of the CIB claim) also weighs against a finding of excusable neglect. Even if this Court were to conclude that Chase learned that its CIB claim was in jeopardy for the first time in early January 2000, when Mr. Marangelli submitted cure documentation to the Settlement Administrator, the 3-month delay before Chase filed its Rule 60(b) motion in April, 2000 is also inexcusable under these circumstances. Chase, a sophisticated institutional investor, aware of the strict deadlines and the need to cure deficient proofs of claim, should have contacted Valley Forge once it discovered that its claims were in jeopardy. Instead, as discussed, it simply forwarded the cure documentation in, five months late (or four months past the extended deadline of September 7), without an excuse. Chase then failed to follow up on this information although it knew the response was late. Because the delay here (between the August rejection letter and filing of the motion, or between the receipt of the August 5 letter in November and the motion, or between the January 4 response to the August 5 letter and the filing of the motion) was simply unexplained, the delay was unreasonable and weighs heavily against a finding of excusable neglect.

The Court does not find that the length of Chase's delay in bringing its April 2000 Rule 60(b) motion with regard to the CIB claim had a negative impact on judicial proceedings. The Court had previously devoted substantial time and effort to analyze the myriad excuses offered by other claimants "from Texas to Montana to Hawaii to New York." (JA at 1278.) Although Cendant had a legitimate expectation to finality once the deadlines were set, the Court does not find there to have been any actual negative impact on the proceed-

ings because Cendant's liability was capped. However, to deem this conduct excusable neglect has the potential to negatively impact similar proceedings in the future by providing a disincentive for claimants to monitor their claims diligently. This, in turn, has the potential to burden courts with a flood of Rule 60(b) motions by late claimants. Nevertheless, because of the lack of actual impact here, this part of the "length of delay" factor weighs neutrally in the equitable analysis.

### 3. Good Faith

Courts must also examine whether the movant acted in good faith. The Third Circuit in *Santander* characterized this inquiry as directed toward both the delays in the claim filing process and in the filing of the Rule 60(b) motion. *See* 235 F.3d 176, at 183–84. Cendant argues that Chase evidenced bad faith because it allegedly failed to bring to this Court's attention its January responses to the August 5 letters in Chase's original brief in support of its Rule 60(b) motion. Cendant contends that only negative inferences could be drawn from such information, such as (1) the unreasonable delays inherent in Chase's internal mail system, (2) Chase's awareness that its CIB claim was still in jeopardy of being rejected in January 2000, (3) Chase's ability to submit documentation other than brokerage statements showing PRIDES ownership, and (4) the fact that other Chase Class Action Group employees besides Ms. Collins were also responsible for curing Chase's claims, namely Mr. Alex Marangelli.

The Court finds that this information was omitted from Chase's original brief. While the Court is not prepared to say this constitutes evidence of bad faith, it does weigh against a finding of good faith. This omission, along with the other evidence already considered by this Court, reflects Chase's lack of diligence in monitoring its claims, particularly Mr. Marangelli's decision to mail in the 5–month late cure documentation without so much as a phone call. More important, however, is Chase's "excuse" which it has repeated throughout the briefing of this motion: namely, its unexplained alleged failure to receive either the first request to cure or the August rejection letter. As this Court stated in its earlier opinion, the asserted failure to receive this letter, along with numerous other letters, all of which this Court concludes were in fact received, gives this Court the "(circumstantial) sense" that Chase's " 'asserted inadvertence[s] reflect[ ] an easily manufactured excuse incapable of verification by the court.' " *In re Cendant Corp. Prides Litig.*, 98 F.Supp.2d at 608, quoting *Dominic v. Hess Oil V.I. Corp.*, 841 F.2d 513, 517 (3d Cir.1988). And even if those two letters had never been received, such is of no moment because Chase manifested a lack of good faith in its pursuit and monitoring of its claims once the August 5 letter reached the Class Action Group in November.

Accordingly, the Court concludes that Chase's showing of good faith in presenting its Rule 60(b) motion is questionable at best, and does not outweigh Chase's completely unreasonable excuse.

### 4. Prejudice to Cendant

As this Court pointed out in its Court's October 21, 1999 decision, Cendant would not suffer any prejudice from the grant of Chase's motion because the original limits of Cendant's financial obligations under the Settlement would not be expanded. *See also In re Cendant Corp. PRIDES Litig.*, 234 F.3d 166, 171 n. 8 (3d Cir.2000) ("[S]ince the only 'prejudice' Cendant would suffer by being forced to pay Chase is the 'loss of a windfall,' we conclude that Cendant will not suffer any prejudice.").

Although Cendant would not suffer any actual financial prejudice, this Court nevertheless concludes that Cendant, as any defendant, was entitled to an expectation of finality in the settlement deadlines after this Court's grant of one extension. Otherwise, settlement deadlines are meaningless to the parties and the Court.

In conclusion, three of the four excusable neglect factors, including the key factor, reason for the delay, weigh against Chase. Accordingly, the Court adheres to its earlier decision denying Chase's Rule 60(b) motion with regard to the CIB claim.

### B. The IFA and World Growth Claims

#### 1. Reason for the Delay

Chase has offered no justifiable reason why it failed to provide any excuse to the Court for evaluation of its late cure documentation with regard to the IFA and World Growth claims until it made its Rule 60(b) motion. As with CIB, Chase again asserts its unexplained alleged failure to receive two letters, which this Court has already concluded Chase received, namely the August 27, 1999 letters which required submission of excuses to the Court for

late-cured proofs of claim. It again also relies upon its unexplained late receipt of the August 5 request to cure letters in November. Chase again attempts to blame the Settlement Administrator for the Class Action Group's claimed failure to receive the August 27, 1999 notices, and then attempts to blame Lead Counsel for Chase's admitted receipt and then loss of a January 17, 2000 letter informing Chase that its IFA and World Growth claims had been denied by the Court.[21] As discussed in detail, this Court finds that Chase did receive both August 27 letters and received them timely.[22] If they were lost, the Court concludes that this is the result of Chase's own inadequate internal mail distribution system. In addition, the Court finds that Chase received the two August 5 letters timely, and that any delays in distribution were due to its own inadequate internal mail distribution system. Chase provides nothing but speculation to suggest that either Valley Forge did not mail them timely or that the Postal Service is to blame. The Court rejects that unsupported theory because it finds that Cendant has adequately proved that Valley Forge mailed the letters and Chase

---

21. The need for the excuse in the first instance arose because of Chase's own neglect in failing to respond timely to the initial requests to cure. As this Court has explained, Chase offers no reason why its Class Action Group did not receive the July 15 requests to cure until July 28, or why it took Ms. Collins so long to locate acceptable cure documentation. Ms. Collins could have contacted Mr. Marangelli, who was in charge of Chase's proofs of claim, but did not do so. Nor did she consult the original proof of claim form instructions which would have indicated what would be acceptable documentation. She also did not call Valley Forge for clarification, which she could have done. Chase could and should have had more reliable procedures in place to deal with these requirements, knowing that the *Prides* settlement was of tremen-

dous value to Chase and that it contained important deadlines.

The Court also rejects Chase's argument that the 20–day response time was inadequate. Ms. Collins could have contacted the settlement administrator for clarification but did not. Moreover, the Court has already found the cure period reasonable because it was heavily negotiated and because Chase already had notice of the type of documentation it would be required to produce. *See* 98 F.Supp.2d at 608.

22. However, because Chase argues that it did not receive the letters at all, Chase's additional arguments that (1) the 20–day response time was insufficient, and (2) the letter did not provide sufficient notice of the mandatory nature of the excuse, are irrelevant.

has failed to rebut the presumption of timely receipt which results.

Moreover, Chase admits that it received the August 5, 1999 Requests to Cure with regard to the IFA and World Growth claims, at least by November 15, 1999. As with CIB, by that time, Chase knew that these two claims were in jeopardy of being disallowed for failure to cure. However, as with the CIB claim, Chase waited until January 4, 2000 before attempting to cure the IFA and World Growth claims, and then withheld this fact from the Court in its original Rule 60(b) motion. Moreover, neither Mr. Marangelli nor anyone else at Chase called Valley Forge, either in November or January to attempt to verify the status of the two claims.[23] Again, conspicuously absent from the record is any explanation from Mr. Marangelli or anyone else from Chase why those two months elapsed between the receipt of the August 5 letter at the Class Action Group in November and the January response thereto.

Finally, Chase admits it received Lead Counsel's January 17 letter which notified claimants of this Court's January 14 decision which disallowed certain claims, including IFA and World Growth. The Court has already found reasonable Lead Counsel's decision to send that letter by Federal Express and that Lead Counsel was reasonable to forward it to the Brooklyn address as directed by Chase. Chase's representative, Mr. Puddie, signed for the letter, and this letter was apparently lost in Chase's internal mail distribution system. Chase offers no explanation for this. Chase was aware that it was to expect a piece of important correspondence from Lead Counsel but never inquired as to why the mail never reached its intended destination.

Again, Chase's mere assertion that Chase did not receive the August 27 letters which required submission of an excuse to the Court amounts to no excuse at all. It also offers nothing to explain the delay in distribution of the August 5 letter, (or its failure to respond quickly to that letter) or the loss of the January 17 letter. Furthermore, although Chase, through its Second Vice President, Mr. Marangelli, knew by early January 2000 that the IFA and World Growth claims were in jeopardy, no one from Chase diligently followed up on the status of those two claims until April 2000. Chase offers no reason why it could not have made itself aware of the status of those claims earlier. It offers no explanation why someone from Chase did not inquire of Valley Forge or Lead Counsel whether there was anything else that needed to be done. Instead, Chase did nothing until April. As this Court concluded with regard to the CIB claim, Chase's delays are simply *unexplained* and cannot constitute excusable neglect. For the same reasons expressed with regard to CIB, the *Santander* decision does not compel a contrary conclusion.

### 2. The Length of the Delay

This Court has already concluded that the two-month delay in filing the motion after the Court's January 14 order became final and appealable in February was reasonable. However, Chase's delay in investigating the status of its IFA and World Growth claims, as discussed above, was unreasonable and also weighs against a finding of excusable neglect.

---

**23.** Nor can Chase rely on its argument that Ms. Collins had allegedly been told that the two claims were in order when she sent in the August 12 fax, because clearly Mr. Marangelli realized the need to send additional cure documentation, which indicates his knowledge that the claims were in jeopardy.

As with the CIB claim, the Court also concludes that the length of Chase's delay in bringing its April 2000 Rule 60(b) motion with respect to the IFA and World Growth claims had no actual negative impact on judicial proceedings, mainly because it would not prejudice Cendant. However, the Court again notes that to deem this conduct excusable has the potential to create a disincentive for claimants to monitor their claims diligently and to create undue burdens on the courts and future litigants in class actions. Nevertheless, this factor again weighs neutrally at best in the analysis and does not outweigh the unreasonable excuse offered by Chase.

### 3. Good Faith

As with the CIB claim, Chase has not been completely forthcoming in bringing its Rule 60(b) motion to the Court in respect of the IFA and World Growth claims. In its original Rule 60(b) motion, Chase conspicuously failed to inform the Court of Chase's January 4, 2000 submissions in response to the Settlement Administrator's Requests to Cure the IFA and World Growth claims. As with CIB, the evidence reviewed by this Court and this omission supports an inference that Chase, through Mr. Marangelli, failed to monitor the status of its claims diligently. The failure to place even a telephone call to Valley Forge upon discovering that the cure documentation was five months late indicates a lack of good faith in the claims process.

Accordingly, the Court concludes that Chase's showing of good faith in presenting its Rule 60(b) motion is questionable at best and cannot outweigh Chase's lack of a reasonable excuse.

### 4. Prejudice to Cendant

For the same reasons stated in the analysis of the CIB claim, the Court concludes that Cendant would not suffer any prejudice from the grant of Chase's motion. The Court again emphasizes that Cendant, as any defendant, is nevertheless entitled to an expectation of finality in the settlement deadlines.

In conclusion, three of the four excusable neglect factors again weighs against Chase, but particularly its unreasonable and unexplained delay. Accordingly, the Court adheres to its decision to deny Chase's Rule 60(b) motion with regard to the IFA and World Growth claims.

### IV. Chase's Due Process Rights Were Not Violated

### A. The 20–Day Cure Period

Chase again contends, as it did in its original motion, that the 20–day period to respond to a Request to Cure was unconstitutional. This Court previously held that the response time was constitutional and reasonable under the circumstances, because this deadline was heavily negotiated by the parties; Chase was on notice its claims were at risk; and already knew the information they were required to provide to participate in the settlement. *See* 98 F.Supp.2d at 608. The Third Circuit declined to address the Due Process argument, so this Court will not address it again but instead directs the parties to its earlier decision at 98 F.Supp.2d at 608.

### B. Notice of This Court's October 21, 1999 Decision

Chase's argument that its constitutional rights were violated because Lead Counsel did not provide it with notice of the Court's October 21, 1999 order is equally without merit. In the October 21 decision, the Court did no more than decide to consider—upon review of any excuse offered by September 7, 1999 by a claimant for its untimely submission of a Proof of Claim or

cure—whether the untimeliness was due to excusable neglect. (JA at 16–19, 589–91.) This order had absolutely no impact on Chase's claims, however, because, as discussed herein, by September 7, 1999 Chase had not presented for consideration by the Court any excuse for its failure to cure the CIB claim or its untimely cures of the IFA and World Growth claims. There was no need to inform claimants of this decision because it did not expand claimants' deadline to submit excuses to the Court beyond September 7, 1999 and consequently the lack of notice to individual claimants of this order could not have violated Due Process.

## CONCLUSION

For the foregoing reasons, Chase's motion to vacate (1) the January 14, 2000 order which disallowed its IFA and World Growth claims and (2) the Settlement Administrator's rejection of its CIB claim is denied.

**SO ORDERED.**